[No. D060327. Fourth Dist., Div. One. Dec. 20, 2012.]

THE PEOPLE, Plaintiff and Respondent, v.
PHILONG N. HUYNH, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

*Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts IV., V., VI., VIII., X., XI., and XII.

## Counsel

Waldemar D. Halka, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton and James H. Flaherty III, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**HALLER, J.**—A jury convicted Philong N. Huynh of first degree felony murder (Pen. Code,[1] § 189), two counts of sodomy of an intoxicated person (§ 286, subd. (i)) and two counts of oral copulation of an intoxicated person (§ 288a, subd. (i)). The jury also found to be true special circumstance allegations that the murder was committed during the commission of sodomy (§ 190.2, subd. (a)(17)(D)) and during the commission of oral copulation (§ 190.2, subd. (a)(17)(F)). The trial court sentenced Huynh to an indeterminate term of life in prison without the possibility of parole plus a consecutive determinate term of 10 years.

Huynh appeals, contending (1) there was insufficient proof of death by criminal agency; (2) insufficient evidence supported the sodomy and oral copulation convictions involving the murder victim; (3) the jury instructions on first degree felony murder did not properly address causation; (4) the trial

---

[1] Statutory references are to the Penal Code unless otherwise specified.

court erroneously instructed the jury on other sex crime evidence; (5) Evidence Code section 1108 is unconstitutional; (6) the court erred by refusing to give lesser-included-offense instructions on the sodomy and oral copulation counts involving the murder victim; (7) the court erred by refusing to instruct the jury on second degree murder; (8) the court erred by not instructing the jury sua sponte on involuntary manslaughter; (9) the court erred by allowing a SART (sexual assault response team) nurse to testify about a sexual assault examination conducted by another SART nurse; (10) the court violated his right to confront adverse witnesses by admitting the preliminary hearing testimony of the nonhomicide sexual assault victim; (11) the court erred by refusing to advise the jury that the nonhomicide sexual assault victim refused to attend the trial; and (12) reversal is required because of the cumulative nature of the errors.

## FACTS

### Prosecution's Case

In January 2008, Dane Williams, 23, started working for Hurley International, a clothing company based in Orange County. By all accounts, Williams was heterosexual. The company was taking part in an industry trade convention in San Diego toward the end of the month. Williams drove a company bus to San Diego on the Wednesday before the convention was to start. On the night of January 25, a Friday, Williams went to nightclubs/bars with his friends and coworkers in the Gaslamp district of downtown San Diego. Brandon Guilmette, who was a longtime friend of Williams and a Hurley coworker, left the group at 1:00 a.m. to return to the Marriott Hotel. According to Guilmette, Williams had several cocktails, but was "pretty put together still." Others in the group also said that Williams appeared in control of himself at that time despite his drinking.

However, about an hour later, a Hurley senior designer saw Williams in front of the Marriott Hotel and he appeared "discombobulated" or "[d]efinitely intoxicated." About 2:20 a.m., a woman saw Williams, who was alone and swaying, in front of the hotel. The woman, who did not know Williams, said he appeared to be "drugged"; he was unbalanced and fell facedown. When the woman attempted to assist him, Williams stood up, leaned against a wall, and then staggered off. The woman said Williams was unable to speak.

Williams did not return to his hotel room and did not show up for work the next day.

Williams's body, which was lying facedown and rolled in a blanket, was found in an alley in the Mid-City area on Tuesday, January 29, about 6:30 a.m. Williams was wearing the same clothes he had been wearing the night he disappeared, but his underwear and his watch were missing. Also, a beanie cap was on top of Williams's head; Williams had not been wearing the beanie cap the night he disappeared.

Semen belonging to someone other than Williams was found on his shirt. Dog hairs were on the blanket that was wrapped around Williams's body. A hair found on Williams's shoe was not his. Carpet fibers were on Williams's clothing. Police saw tire tracks from a van next to the body.

On January 30, Deputy Medical Examiner Othon Mena, M.D., performed an autopsy on Williams. Williams had been dead for one to three days before his body was found. The autopsy revealed lividity in Williams's upper chest area, and a "significant" amount of blood and fluid in Williams's lungs and airways. Williams's lungs were congested and weighed twice their normal weight, which can suggest cardiac death or death from asphyxiation. However, there was no evidence of strangulation, no physical signs of asphyxiation and no evidence of a cardiac event. The autopsy also disclosed a 60 percent blockage of one of the main arteries leading to Williams's heart, but Dr. Mena opined that this narrowing alone was not the cause of Williams's death. There was no trauma to Williams's anus or rectum. Toxicology tests results showed a blood-alcohol level of between 0.17 percent and 0.21 percent. Williams's blood also contained a therapeutic level (0.36 mg/L) of diazepam, a benzodiazepine drug.[2] Trace amounts of diazepam were also found in Williams's gastric contents. According to Mena, the levels of alcohol and diazepam were insufficient to have caused Williams's death, but played a role in the death. (See fn. 2, *ante*.)[3]

Dr. Mena could not determine the cause or manner of Williams's death and listed them as "undetermined" in his autopsy report.[4] At trial, Mena opined the most likely cause of death was asphyxiation by a person or from the position Williams was in.

Williams's death remained unresolved for 18 months.

On Saturday, June 6, 2009, Jeremiah R., a heterosexual Navy corpsman who was recently assigned to Camp Pendleton, visited downtown San Diego.[5] While walking around the Gaslamp district, Jeremiah encountered

---

[2] The benzodiazepine class of drugs is, like alcohol, a central nervous system depressant, commonly used as a tranquilizer. Alcohol and benzodiazepines have an additive effect when used together. In addition to diazepam, another generic benzodiazepine is clonazepam. Brand names for benzodiazepines include Rivotril, Klonopin, Xanax and Valium.

[3] The county's chief medical examiner, as well as experts called by both parties, agreed that although the combination of diazepam and alcohol did not cause the death of Williams, it played an important role.

[4] Dr. Mena's testimony as well as that of experts called by each party will be further addressed below in the Discussion portion of this opinion. (See pt. I., *post*.)

[5] Jeremiah testified at Huynh's preliminary hearing in December 2009, but did not testify at Huynh's trial. The preliminary hearing testimony was videotaped and portions of the videotape were played for the jury.

Huynh, who asked for a cigarette and introduced himself as "Phil." Huynh asked Jeremiah if he wanted to go to "strip clubs" and offered to pay for a lap dance, but Jeremiah declined. When Huynh mentioned he had a rental car and asked if Jeremiah wanted to go somewhere else, the corpsman said he wanted to see the local beaches. Before arriving at Ocean Beach, Huynh bought two pint-size bottles of cognac at a liquor store. Jeremiah consumed a pint of cognac while at Ocean Beach. Huynh told Jeremiah that he had recently moved to San Diego after a divorce. Jeremiah assumed Huynh was a heterosexual by the way he acted.

When Jeremiah mentioned he had a headache, Huynh gave him one or two pills from a Tylenol bottle, which was inside the car. Huynh then drove to Mission Beach with Jeremiah. Other than playing basketball at Mission Beach, Jeremiah's recollection of the rest of the night was hazy. He remembered he felt intoxicated, but did not think it was from the cognac.

Jeremiah agreed to go to Mexico with Huynh, but had no recollection of going to Mexico. Jeremiah believed he went to Mexico because a photo in his cell phone showed him standing under a "Mexico" sign on the Mexican side of the border.

Jeremiah remembered going to Huynh's residence, where he watched television in the living room before "crash[ing]" on the bed in Huynh's bedroom; Jeremiah was fully clothed. When Huynh tried to wake him up, Jeremiah said he wanted to go back to sleep. At the time, Jeremiah also heard Huynh talking to someone else.

The next day—Sunday, June 7—Jeremiah was back at Camp Pendleton, but he did not recall how he arrived there, other than being on a bus and hitting his nose when the bus driver made a quick stop. Jeremiah was missing his underwear and his pocketknife. Jeremiah felt "strange" and disoriented, and he was slurring his words. A supervising corpsman took Jeremiah to the emergency room on the base. The emergency room doctor ordered a drug screen, which came back positive for benzodiazepine. Because he was concerned that Jeremiah might have been drugged by someone, the doctor told the nursing staff to contact the San Diego Police Department.

On June 8, Jeremiah underwent a SART examination, which showed (1) his anus had abrasions and lacerations, including two open wounds, and (2) the end of the anal canal was red, which is not normal, and swollen, which indicated trauma to the rectum. The SART nurse flossed Jeremiah's teeth and took swabs from his mouth, anus, rectum, penis and scrotum; these were provided to the police, along with Jeremiah's blood and urine samples.

A police forensic analyst ascertained that the scrotal, anal and rectal swabs, as well as dental floss from Jeremiah's mouth, contained semen that did not

belong to Jeremiah. Based on the semen, a DNA analyst generated a DNA profile, which was placed in a law enforcement database. This DNA profile matched the foreign DNA profile of the semen found on Williams's shirt 18 months earlier.

The level of clonazepam in Jeremiah's blood was 33 nanograms per milliliter. A therapeutic blood level of clonazepam is between 16 and 30 nanograms per milliliter. However, the metabolite (breakdown) of clonazepam was 128 nanograms per milliliter. Therefore, if Jeremiah had ingested the drug around midnight of June 6, the blood level of the drug would have been about twice the level that was detected—an amount substantially in excess of a high therapeutic dose.

Police used Jeremiah's cell phone records to track down Huynh. Jeremiah selected Huynh from a six-pack photographic lineup.

On September 10, police stopped and arrested Huynh as he was driving an Infiniti that was registered to him. Police found prescriptions and receipts from Mexico for Rivotril (see fn. 2, *ante*) in Huynh's wallet and a pill crusher in a bag on the floor of the vehicle. Inside the side pocket of the driver's side door there were two prescription bottles of Viagra and one prescription bottle of Ambien.

Police also searched the car of Huynh's mother, a Subaru, which Huynh had been driving earlier that day. Police found Huynh's pay stubs, mail, receipts for diazepam and Abilify prescriptions, four Mexican pharmacy receipts and prescriptions for Rivotril, which were purchased between March and October 2008. Also in the Subaru were bank statements, including one showing a September 2008 withdrawal of money in Tijuana, and rental documents of a Dodge minivan from Enterprise-Rent-A-Car dated January 28, 2008. Police also found a list of pornographic movie titles, including "Straight Buddy Seduction," "Straight Meat, Hung and Full of Cum," and "Straight Buddy Sex."

Police searched the residence at 5360 1/2 Wightman Street, where Huynh and his mother lived. In Huynh's bedroom, police found a book about homosexuality in the military and homosexuals who are interested in men in the military. Also in the bedroom was a lockbox, which contained two watches that did not belong to Huynh. In the kitchen, police also found 12 empty prescription bottles in Huynh's name for, among other drugs, Viagra, Levitra, clonazepam, and diazepam. The prescription bottle for diazepam indicated the prescription was filled on January 25, 2008.

An FBI forensic computer expert examined a computer which police confiscated from the Huynh residence. The expert found a Yahoo user profile

that had been set up as "I like str8 guys 2." The expert also found numerous craigslist postings from "Ph" using various e-mail addresses including "dhuyhn20@cox.net." One post read: "I work down at Adelita's. I like masculine guys. Come to TJ and see me some time. The beer is on me." The expert also found a response to a craigslist posting about Tijuana in which "Phil," using an e-mail address of "dhuyhn20@cox.net," wrote he would "pay for everything, clubs, titty bars." Some of the e-mails included photographs of Huynh. In one of these photographs, there was a blanket similar to the one in which Williams's body was wrapped.

Police also found documents in the residence which indicated that Huynh attended the Kirksville College of Osteopathic Medicine for two years. Among the classes Huynh took there was a course in pharmacology, which included the study of the benzodiazepine class of drugs. The chairman of the pharmacology department at the college testified that students in the course learned that benzodiazepines can create an "amnesia-like" state and can lead to unconsciousness and loss of any ability to resist. Additionally, the pharmacology students learned that if alcohol is ingested as well, these effects are intensified.

After Huynh was arrested, police took a DNA swab from his mouth. The DNA was profiled and compared to the DNA evidence collected from Williams and Jeremiah.

Huynh's DNA was found on the sperm fraction of the DNA on Williams's shirt. The probability of someone at random matching that profile is one in 990 quintillion Caucasians, one in 4.5 sextillion African-Americans and one in 6.6 sextillion Hispanics.[6] Huynh's DNA was found on the beanie cap. The probability of someone at random matching that profile is one in 19 million Caucasians, one in 120 million African-Americans and one in 110 million Hispanics. The DNA profile from a hair found on Williams's shoe matched the DNA profile of Huynh's mother. DNA analysis also showed that hairs found on the blanket which was wrapped around Williams's body belonged to Huynh's dog. The probability of a random dog's DNA matching the DNA from the dog hairs on the blanket is one in 2.4 trillion. Fibers found on Williams's clothing matched the fibers of the carpet located in Huynh's residence.

Tire tracks found next to Williams's body matched the tires, wheel base and front-wheel-drive system of the Dodge minivan that Huynh had rented on the day before Williams's body was found. Fibers found on Williams's clothes matched the carpet fibers of the van that Huynh had rented.

---

[6] Probability statistics for DNA comparisons are typically based on these three major racial groups. The statistics for Asians would be lower, but not significantly.

Huynh's DNA was found in the sperm fraction of the DNA collected from Jeremiah's penis, scrotum and anus. The probability of someone at random matching that profile is one in 990 quintillion Caucasians, one in 4.5 sextillion African-Americans and one in 6.6 sextillion Hispanics, with a slightly lower figure for Asians.

In 2006, an adult video company hired Huynh to perform computer work for the company. Huynh told one of the company's owners that he liked "[y]oung, straight" men and wanted to have anal sex with them. Huynh also said he picked up young heterosexual men, many of whom were in the military, offered to buy them drinks and prostitutes in Tijuana, took them to a Tijuana bar to get them drunk, slipped pills into their drinks, brought them to a hotel and had sex with them when they passed out.

In January 2011, representatives of the San Diego County District Attorney flew to Chicago to interview Ryan R. in connection with the Huynh case. Ryan, a San Diego native, had relocated to Chicago in 2009. In 2007, Ryan, then 19 years old and a recent high school graduate, worked as a video editor for the same company that employed Huynh. The company also paid Ryan to be filmed masturbating. Ryan and Huynh often had lunch together, and Ryan believed Huynh to be a heterosexual like himself. Huynh frequently invited Ryan to accompany him to Mexico and offered to pay for drinks and girls. The two owners of the video company had warned Ryan that Huynh liked to take young men to Tijuana, where he would get them drunk, "slip" them drugs and then sexually assault them. But Ryan did not believe the owners. One night Ryan phoned Huynh because he was bored. Huynh suggested they go to a "titty bar" in Tijuana, and Huynh took Ryan to a strip bar called "Purple Rain." Huynh bought Ryan three or four beers and suggested they rent a hotel room to use as their "home base." Once in the hotel room, Huynh placed a pill in a bottle of water and offered it to Ryan, who at first declined to drink from the bottle. Because Ryan had "a guard up," he asked Huynh to drink from the bottle first. Ryan could not remember the rest of the evening. He woke up the next morning facedown on a hotel bed with his shirt off and his pants undone. Ryan felt "hung over," but not like one would feel from drinking too much alcohol. He also felt like he had been sodomized. Ryan looked for Huynh, but could not find him.

Also, after Huynh's arrest was reported in news media, three other young men, all heterosexual, contacted police about their experiences with Huynh.

In April 2008, Maksim I. was clubbing in downtown San Diego with his wife and a friend. While his wife and friend were waiting in a line to get into a nightclub, Maksim walked to a nearby store, where Huynh approached him, and the two talked. Maksim returned to his wife and friend at the club. After

his wife left with her friends, Maksim and his friend went to another bar. Huynh was at this bar. When the bar closed, Maksim and his friend went outside, where they saw Huynh. The three of them started talking about Mexico and Huynh's offer to pay for the "girls." Maksim and his friend agreed to go with Huynh and the three went to Adelita's in Tijuana. Maksim's friend was feeling ill and decided to go home. After Maksim drank two beers, he and Huynh went to a hotel room. Waiting in the hotel room for girls to arrive, Maksim said he was thirsty and Huynh gave him a Sprite soft drink. Maksim's next memory was waking up in the hotel room at 4:00 p.m. the next day; the door to the room was open. Maksim's debit card and watch were missing. At trial, Maksim testified he felt numb, disoriented and confused. Maksim also identified one of the watches from the box in Huynh's residence as the one he had been wearing that night.

On May 24, 2009, Fernando P., a 21-year-old sailor in the Navy, was drinking rum in the Gaslamp district when Huynh approached and started a conversation. Huynh told Fernando he was divorced and was going to go to strip clubs in Tijuana. Huynh invited Fernando to accompany him and offered to pay for drinks and strippers. Fernando, who thought Huynh was interested in women, accepted the invitation. At Adelita's, Huynh bought beers. Fernando soon began to feel strange and when he mentioned this, Huynh said it was time to go to the hotel room because the girls were on the way. Huynh repeatedly told Fernando to take a Viagra pill, and in the hotel room Huynh attempted to force Fernando to do so. Fernando felt dizzy, weak and nauseated, but pushed Huynh away and ran out of the hotel room. He ran until he fell into a ditch. Fernando spent two days in a hospital in a coma; he had arrived at the hospital shirtless.

On Friday, August 21, 2009, David G., a 25-year-old college student who lived in downtown San Diego, was drunk when he went looking for some late-night food. Huynh walked up to David and said, "Hey, what's up?" Huynh also said he wanted to go to Mexico and invited David to accompany him, saying he would pay for everything. David agreed. At Adelita's in Tijuana, Huynh said he wanted Ecstasy and Viagra, but David said he did not take drugs. At one point, Huynh went to the bar and returned with an open beer bottle for David. Huynh then said he had a room and "girls" would "come over." After walking out of Adelita's, David blacked out. He awoke the next day in a hotel room. The door was ajar and David was fully clothed, but had scratches on his arm and shoulder. David felt horrible, dizzy and confused. At trial, David identified one of the watches that police found in the box in Huynh's residence as the watch he had been wearing on the night he met Huynh.

*Defense Case*

About 2:00 a.m. on January 26, 2008, a coworker encountered Williams near the Marriott Hotel. Williams, who was "pretty out of it," suggested they " 'do something.' " The coworker was tired and went to his hotel.

The defense also presented evidence that Williams's body was left in the alley between 9:00 p.m. and 10:00 p.m. on January 28, 2008.

Roger Miller, a DNA expert, testified the eight sperm cells found in Williams's anal swab were not significant because there was insufficient genetic material to perform DNA testing. Miller also said the sperms cells could belong to Williams because sperm is easily transferred. Miller added he would expect to find sperm cells in 100 percent of men's underwear. Miller also discounted the notion that the sperm found in Williams's anus belonged to Huynh simply because Huynh's sperm was found on Williams's shirt.

Although sperm was found on David G.'s shirt, the DNA profile obtained from the sperm matched David's own DNA profile and excluded Huynh.

A physician from Sharp Chula Vista Medical Center testified that when Fernando P. was brought to the hospital, his blood-alcohol level was 0.23 percent. Fernando P. was so intoxicated he had to be intubated and placed on a ventilator. A toxicology screen did not reveal any drugs in his system.

The defense also presented the testimony of three pathology experts, which will be discussed below. (See fn. 4, *ante.*)

## DISCUSSION

### I. *Sufficient Showing of Criminal Agency*

Huynh contends his murder conviction must be reversed because there is insufficient proof of death by criminal agency. The contention is without merit.

Because Huynh's contention is based on conflicting medical evidence presented at trial, we begin by relating the medical testimony in more detail.

In responding to hypothetical questions by the prosecution, Dr. Mena said that a penis placed in a person's mouth could make it more difficult to breathe and could cause that person's death if he or she had a 0.17 percent

blood-alcohol level and had ingested benzodiazepine as well.[7] Mena also testified that if he had known that Huynh gave Williams benzodiazepine and sexually assaulted Williams, he would have changed the cause of death to "sudden death during or around the time of sexual assault while intoxicated" and changed the manner of death to homicide.

In addition to Dr. Mena's testimony, the prosecution presented the expert testimony of Jonathan Benumof, M.D., an anesthesiologist and cardiovascular specialist who opined the cause of Williams's death was an "external obstruction to breathing."[8] Pointing to the excessive postmortem weight of Williams's lungs, Dr. Benumof concluded there was a "complete" obstruction to breathing, which had caused "negative pressure pulmonary blood and edema." Benumof also opined the combination of alcohol and diazepam contributed to Williams's death by "hamper[ing] any effective opposition [Williams] would have mounted" against the external obstruction to his breathing. Benumof did not know what the obstruction to Williams's breathing was, but opined that a penis in his mouth could have caused such a complete obstruction.

The defense presented the testimony of Glenn Wagner, M.D., the chief medical examiner for San Diego County, and Christopher Swalwell, M.D., a deputy medical examiner. Both doctors testified that there was a consensus in the office that the cause and manner of Williams's death were "undetermined." Further, the consensus did not change after prosecutors and police provided the office with additional information, including the prosecution's theory that (1) Huynh had drugged Williams with benzodiazepine and sexually assaulted him and (2) Huynh's DNA was found on Williams.

Dr. Wagner also testified the medical examiner's office is usually disinclined to classify the cause and manner of death as "undetermined." Wagner said Williams's death was one of those unusual cases where medical examiners are unable to determine what happened despite a comprehensive autopsy and attention to physical detail.[9]

---

[7] Dr. Mena responded similarly when the prosecutor changed the hypothetical from a penis in a person's mouth to situations in which (1) the person is lying facedown while being sodomized, (2) someone is sitting on the person's chest, or (3) the person's neck is turned while he was being sexually assaulted.

[8] Dr. Benumof is not a pathologist and has not performed an autopsy other than in medical school. Benumof testified he reviewed Dr. Mena's report and his testimony at the preliminary hearing; he did not, however, view any of the autopsy photographs or slides.

[9] In answering a hypothetical posed by the prosecution, Dr. Wagner opined that if it were established that Huynh gave Williams benzodiazepine and sexually assaulted him, Wagner would agree with Dr. Mena the cause of death should be changed to sudden death during sexual assault and the manner of death should be changed to homicide.

The defense also presented the expert testimony of Todd Grey, M.D., the chief medical examiner for Utah, who opined Dr. Mena did a thorough examination of Williams's body and provided a well-reasoned autopsy opinion. Grey testified he agreed with Mena's certification of the cause and manner of Williams's death as "undetermined." Grey opined the 60 percent occlusion of Williams's coronary artery is rare for a 23-year-old person and possibly played a role in the death. Grey said the blockage possibly caused Williams's death from a heart attack that could not be ascertained postmortem. Grey said other possible causes of Williams's death include a lethal seizure, cardiac arrhythmia, suffocation and the combined effects of alcohol and diazepam in his system leading to a suppression of respiration or a "diminution of his drive to breathe."

Dr. Grey also criticized Dr. Benumof's opinion that Williams died from a total obstruction of his airways. Grey said congested lungs that are full of fluid are present in other types of deaths. Grey testified a medical examiner does not properly determine the cause of death based on the weight of the decedent's lungs and the fact they were congested because such findings do not prove airway obstruction. Edema and frothy fluids can be present in "all kinds of different situations and causes of death," including "slow cardiac deaths" and "respiratory depression." Grey also criticized Benumof's methodology and opinion in part because Benumof offered his opinion before reviewing any materials in the case, including the autopsy report.

■ Because all of the testifying *pathologists* and *medical examiners* (see fn. 8, *ante*) agreed the manner and cause of Williams's death were "undetermined," Huynh argues the prosecution failed to prove criminal agency—that is, the criminal act of another was the cause of death. (See *People v. Ives* (1941) 17 Cal.2d 459, 464 [110 P.2d 408].) The term "criminal agency" is usually used in the context of establishing the corpus delicti. " 'The elements of the corpus delicti are (1) the injury, loss or harm, and (2) the criminal agency that has caused the injury, loss or harm.' " (*People v. Kraft* (2000) 23 Cal.4th 978, 1057 [99 Cal.Rptr.2d 1, 5 P.3d 68].) "In a prosecution for murder, as in any other criminal case, the corpus delicti—i.e., death caused by a criminal agency—must be established independently of the extrajudicial statements, confessions or admissions of the defendant." (*People v. Towler* (1982) 31 Cal.3d 105, 115 [181 Cal.Rptr. 391, 641 P.2d 1253].)[10] The corpus

[10] In this regard, "[t]he purpose of the corpus delicti rule is to assure that 'the accused is not admitting to a crime that never occurred.' " (*People v. Jones* (1998) 17 Cal.4th 279, 301 [70 Cal.Rptr.2d 793, 949 P.2d 890].) Accordingly, before a confession may be introduced, the prosecution must introduce some corroborating evidence that shows someone committed a crime. (*People v. Ochoa* (1998) 19 Cal.4th 353, 405 [79 Cal.Rptr.2d 408, 966 P.2d 442].) The corpus delicti also serves another purpose. " '[T]he corpus delicti is a necessary element of the prosecution's case in a criminal trial . . . . Thus, a precondition to conviction is that the state

delicti of murder consists of the death of the victim and a criminal agency as the cause of that death. (*People v. Small* (1970) 7 Cal.App.3d 347, 354 [86 Cal.Rptr. 478].)

It is undisputed that Williams died; hence, the only issue was whether his death was caused by the criminal act of another. The standard of proof required to show criminal agency is only a reasonable probability; in other words, only a slight or prima facie showing that the criminal act of another caused the death is necessary. (*Matthews v. Superior Court* (1988) 201 Cal.App.3d 385, 392 [247 Cal.Rptr. 226].) "To meet the foundational test the prosecution need not eliminate all inferences tending to show a noncriminal cause of death. Rather, the foundation may be laid by the introduction of evidence which creates a reasonable inference that the death could have been caused by a criminal agency [citation], even in the presence of an equally plausible noncriminal explanation of the event." (*People v. Jacobson* (1965) 63 Cal.2d 319, 327 [46 Cal.Rptr. 515, 405 P.2d 555].)

The corpus delicti may be proved by direct or circumstantial evidence as well as by other acts evidence. (*Matthews v. Superior Court, supra,* 201 Cal.App.3d at p. 392.) In that regard, the fact that Williams's body was found in an alley wrapped in a blanket furnishes at least a prima facie showing of criminal agency, inasmuch as the bodies of victims of accidental deaths typically would not be disposed of in this manner. (*People v. Kraft, supra,* 23 Cal.4th at p. 1057.) An inference of criminal agency in connection with Williams's death is therefore reasonable. Likewise, one could reasonably infer criminal agency by the other acts evidence—namely, that Huynh's modus operandi was to drug young, heterosexual males and then sexually assault them. (*Matthews v. Superior Court, supra,* at pp. 392–393.) Other evidence leading to a reasonable inference of criminal agency includes the semen in the anus and mouth of Williams, a heterosexual; Huynh's semen on Williams's shirt; hair from Huynh's mother and dog on the body; the diazepam in Williams's body and the prescription receipts for the drug found in Huynh's car; Huynh having taken a college course on the effect of drugs, including diazepam; and the tire tracks from Huynh's rental van matching the tire tracks found in the alley where the body was found.

Huynh argues that Dr. Benumof's testimony should be disregarded because he is not a forensic pathologist and his opinions were based on speculation, guesswork and conjecture. However, it is up to the jury—not an appellate court—to determine what weight to give to the testimony of an expert witness. (*People v. Rittger* (1960) 54 Cal.2d 720, 733 [7 Cal.Rptr. 901, 355 P.2d 645].) Also, Huynh ignores the hypothetical questions posed by the

prove that a 'crime' has been committed—otherwise there could not possibly be guilt, either in the accused or in anyone else.' " (*Id.* at p. 404, italics omitted.)

prosecution to Dr. Mena and Dr. Wagner and the doctors' answers. (See fn. 7 & accompanying text, fn. 9, *ante*.) The hypothetical questions and answers were within the scope of proper expert testimony. (*People v. Sims* (1993) 5 Cal.4th 405, 437 [20 Cal.Rptr.2d 537, 853 P.2d 992].)

More significantly, we reject Huynh's implicit notion that an inconclusive autopsy necessarily results in a failure to establish criminal agency, which is at the core of his argument. Case law shows Huynh is mistaken.

In *People v. Towler, supra*, 31 Cal.3d at pages 112 and 113, the murder victim was found on the banks of the Stanislaus River two months after he disappeared. The deterioration of the victim's body precluded the examining doctors from determining the cause of death. (*Id.* at p. 113.) The doctors discounted the cause of death as being from a gunshot, stabbing or strangulation, but were unable to exclude a drug overdose, suffocation or drowning. (*Ibid.*) The defense presented evidence suggesting the victim could have died accidently after using the drug PCP. (*Id.* at pp. 113–114.) Our Supreme Court rejected the defendant's argument that without his extrajudicial statements the evidence was insufficient to establish the victim's death was the result of a criminal agency. (*Id.* at pp. 115–117.) "Although the medical testimony was inconclusive, there was a considerable amount of additional evidence, exclusive of Towler's statements, from which it was reasonable to infer that Stone's death could have been caused by a criminal agency." (*Id.* at pp. 115–116.) Among other things, the Supreme Court noted the victim (1) was a police informant who associated with people involved in illegal drug sales and some of them knew of or suspected his informant role; (2) apparently was worried about his own safety as evidenced by his telling a coworker to contact the police if he did not show up for work; (3) disappeared suddenly without telling anyone where he was going; (4) apparently was taken to the remote river location because he had no vehicle; and (5) was found in the same new clothes he had obtained for his position of assistant manager of a restaurant—an outfit he presumably would not wear for a camping trip to the river. (*Id.* at p. 116.) "All of this evidence, of course, did not rule out the possibility that Stone had died from noncriminal causes. As noted, however, the corpus delicti rule is satisfied 'by the introduction of evidence which creates a reasonable inference that death could have been caused by a criminal agency . . . even in the presence of an equally plausible noncriminal explanation of the event.' [Citation.] We conclude that the evidence is sufficient to support a reasonable inference that death could have been caused by a criminal agency." (*People v. Towler, supra*, 31 Cal.3d at p. 117.)

█ In *People v. Jacobson, supra*, 63 Cal.2d at page 327, the parties presented conflicting medical evidence about whether the drowning death of a

21-month-old child was accidental. Our Supreme Court found the conflict in medical testimony did not rule out a finding of criminal agency. (*Ibid.*) "With two possible contrary inferences before it, the court did not err in ruling that a prima facie showing of corpus delicti had been made. To meet the foundational test the prosecution need not eliminate all inferences tending to show a noncriminal cause of death. Rather, the foundation may be laid by the introduction of evidence which creates a reasonable inference that the death could have been caused by a criminal agency [citation], even in the presence of an equally plausible noncriminal explanation of the event." (*Ibid.*)

In *People v. Johnson* (1951) 105 Cal.App.2d 478, 483 [234 P.2d 116], the doctor who performed the autopsy testified that the fatal gunshot wound could have been self-inflicted because of the position of the entry of the projectile. The doctor also testified that no visible powder burns were on the victim's body. (*Ibid.*) Notwithstanding the inconclusive autopsy evidence on the cause and manner of death, the appellate court found the testimony of a woman living in the apartment directly below the victim's apartment was sufficient to establish criminal agency. (*Id.* at pp. 480, 484–485.) The woman testified that she heard a scream and someone say: " ' "No Ernest, no, don't, don't"[—]something to that effect.' " (*Id.* at p. 480.) The witness continued: " . . . I heard another scream and a thud.' " (*Ibid.*) The appellate court noted: "The outcry, identified as Mrs. Johnson's, was strong circumstantial evidence of an assault or threat of violence of sufficient gravity to evoke the screams and the pleading cry followed by another scream, from which an inference of suicide could not reasonably be drawn." (*Id.* at p. 484.) "[T]he outcry and screams . . . [a]t the very least . . . showed 'a reasonable probability' that the criminal act of another was the cause of death." (*Id.* at p. 485.)

## II. *Substantial Evidence of Oral Copulation and Sodomy*

Huynh contends the oral copulation and sodomy convictions involving Williams were not supported by substantial evidence. Specifically, Huynh points to a lack of evidence (1) linking Huynh to the semen found in Williams's mouth and anus, (2) showing Williams was alive when he was sodomized and orally copulated, and (3) establishing the requisite penetration of the anus or mouth of Williams. The contention is without merit.

Section 286, subdivision (i) criminalizes "an act of sodomy, where the victim is prevented from resisting by an intoxicating or anesthetic substance, or any controlled substance, and this condition was known, or reasonably should have been known by the accused." Section 288a, subdivision (i), criminalizes "an act of oral copulation, where the victim is prevented from resisting by any intoxicating or anesthetic substance, or any controlled substance, and this condition was known, or reasonably should have been known by the accused."

The standard of review for a sufficiency of the evidence claim is well established. We review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Steele* (2002) 27 Cal.4th 1230, 1249 [120 Cal.Rptr.2d 432, 47 P.3d 225].) We presume in support of the judgment the existence of every fact that could reasonably be deduced from the evidence. (*People v. Kraft, supra,* 23 Cal.4th at p. 1053.) We ask whether, after viewing the evidence in the light most favorable to the judgment, any rational trier of fact could have found the allegations to be true beyond a reasonable doubt. (See *Jackson v. Virginia* (1979) 443 U.S. 307, 319 [61 L.Ed.2d 560, 99 S.Ct. 2781].) Unless it is clearly demonstrated that "upon no hypothesis whatever is there sufficient substantial evidence to support [the verdict of the jury]," we will not reverse. (*People v. Redmond* (1969) 71 Cal.2d 745, 755 [79 Cal.Rptr. 529, 457 P.2d 321].)

Huynh is mistaken in arguing no evidence linked him to the sexual assault crimes against Williams. The semen found on Williams's shirt was from Huynh. Moreover, there was additional circumstantial evidence linking Huynh to the sexual crimes. Huynh told his employer that he enjoyed drugging young heterosexual men so he could sexually assault them. Williams had diazepam in his blood; Huynh possessed diazepam and was well schooled on the effect of diazepam and other benzodiazepine drugs. Forensic evidence connected Huynh to the clothing on the dead body as well as the blanket in which the body was wrapped. The tire tracks near the body matched the tires on a van Huynh had rented. In short, there was ample evidence connecting Huynh to the sexual crimes against Williams.

■ The criminal offense of sodomy requires the victim to be alive at the time of penetration. (*People v. Ramirez* (1990) 50 Cal.3d 1158, 1176 [270 Cal.Rptr. 286, 791 P.2d 965].) Huynh argues that oral copulation must also be committed on a live victim. We agree based on the reasoning of the *Ramirez* court and the Legislature's use of the word "person" rather than "body" in both section 286, subdivision (a), which defines sodomy, and section 288a, subdivision (a), which defines oral copulation.[11]

We, however, disagree with Huynh's argument there was insufficient evidence Williams was alive at the time of the sexual assault, and the jury *only* could have found Williams was alive on the basis of "speculation, guesswork and conjecture." Huynh writes: "In light of Williams'[s] severe alcohol intoxication, and based on the absence of the [diazepam] metabolite

---

[11] The Attorney General acknowledges oral copulation of an intoxicated person "reasonably requires that the victim be alive as he or she must be intoxicated."

in his body, it is entirely probable that Williams died right after ingesting diazepam and that any sexual acts took place after his death." However, there was diazepam metabolite in Williams's body. Huynh's comments also ignore expert testimony presented by both parties that the combination of alcohol and diazepam played a role in Williams's death, but was not the cause of death by itself. (See fn. 3 & accompanying text, *ante.*) Moreover, the record does not contain evidence suggesting Huynh intended sexual conduct with a corpse or practiced necrophilia. Rather, the record indicates that Huynh did not have such an intent or practice. The other young men who testified about their encounters with Huynh apparently were drugged by appellant and woke up confused and disoriented. Huynh's modus operandi was to sexually assault young men while they were knocked out by the combination of benzodiazepine drugs and alcohol—not to sexually assault them after they were dead. "[I]n the absence of any evidence suggesting that the victim's assailant intended to have sexual conduct with a corpse [citation], we believe that the jury could reasonably have inferred from the evidence that the assailant engaged in sexual conduct with the victim while she was still alive rather than after she was already dead. Under the applicable standard of review [citations], we conclude that a reasonable trier of fact could have found the essential elements of sodomy beyond reasonable doubt." (*People v. Ramirez, supra,* 50 Cal.3d at pp. 1176–1177; see *People v. Kraft, supra,* 23 Cal.4th at pp. 1059–1060.)

As to Huynh's argument on the insufficiency of the evidence of penetration, we begin by noting that such an argument cannot legally apply to the oral copulation conviction. Penetration of the mouth or sexual organ is not required for the crime of oral copulation. (*People v. Dement* (2011) 53 Cal.4th 1, 41–42 [133 Cal.Rptr.3d 496, 264 P.3d 292].) Sodomy, on the other hand, requires penetration. (*People v. Martinez* (1986) 188 Cal.App.3d 19, 23–25 [232 Cal.Rptr. 736].) "Any sexual penetration, however slight, is sufficient to complete the crime of sodomy." (§ 286, subd. (a).) Huynh relies chiefly on the autopsy finding that there was no sign of trauma to the anus or rectum of Williams, but he ignores evidence that one of the effects of benzodiazepine is to relax the muscles of the anus and rectum. Dr. Mena, who performed the autopsy, testified that injury to the rectum and anus during a sexual assault could be minimized if the person had ingested benzodiazepine. Huynh also points to evidence he presented that sperm cells, which are hardy and easily transferred, are almost always found in male underwear. Huynh argues the eight sperm cells on the anal swab logically could have been from Williams. However, there is no evidence that Williams ejaculated around the time of his death. (*People v. Kraft, supra,* 23 Cal.4th at p. 1059.) The record contains sufficient evidence from which a jury reasonably could infer the requisite amount of penetration occurred.

### III. *Causation Instructions*

██ " ' "[T]he trial court normally must . . . instruct on general principles of law that are closely and openly connected to the facts and that are necessary for the jury's understanding of the case." ' " (*People v. Bivert* (2011) 52 Cal.4th 96, 120 [127 Cal.Rptr.3d 261, 254 P.3d 300].) The court, however, " 'may properly refuse an instruction offered by the defendant if it incorrectly states the law, is argumentative, duplicative, or potentially confusing . . . , or if it is not supported by substantial evidence . . . .' " (*Ibid.*, citations omitted.)

Huynh contends his first degree felony-murder conviction must be reversed because the trial court did not properly instruct on causation. Specifically, Huynh claims the court erred by refusing to instruct on (1) the requirement of a logical nexus between Williams's death and the underlying felony as set forth in CALCRIM No. 730 and in a special instruction requested by defense counsel, and (2) proximate causation as set forth in CALCRIM No. 240. The contention is without merit.

#### *Felony-murder Rule*

██ The felony-murder doctrine provides a killing is first degree murder if "committed in the perpetration" of certain enumerated felonies, including sodomy and oral copulation. (§ 189.) The killing is first degree murder "regardless of whether it was intentional or accidental." (*People v. Coefield* (1951) 37 Cal.2d 865, 868 [236 P.2d 570].) The requisite mental state is simply the specific intent to commit the underlying felony because only felonies which are inherently dangerous to life or pose a significant prospect of violence are listed in section 189. (*People v. Cavitt* (2004) 33 Cal.4th 187, 197 [14 Cal.Rptr.3d 281, 91 P.3d 222] (*Cavitt*).) The elements of the particular felony must be proved and the defendant is entitled, on request, to a specific instruction on the necessity of proving the underlying felony beyond a reasonable doubt. (*People v. Whitehorn* (1963) 60 Cal.2d 256, 264 [32 Cal.Rptr. 199, 383 P.2d 783].)

The purpose of the felony-murder rule is "to deter felons from killing negligently or accidentally by holding them strictly responsible for killings they commit." (*People v. Washington* (1965) 62 Cal.2d 777, 781 [44 Cal.Rptr. 442, 402 P.2d 130]; see *People v. Billa* (2003) 31 Cal.4th 1064, 1069 [6 Cal.Rptr.3d 425, 79 P.3d 542].) "The Legislature has said in effect that this deterrent purpose outweighs the normal legislative policy of examining the individual state of mind of each person causing an unlawful killing to determine whether the killing was with or without malice, deliberate or accidental, and calibrating our treatment of the person accordingly. Once a person perpetrates or attempts to perpetrate one of the enumerated felonies,

then in the judgment of the Legislature, he is no longer entitled to such fine judicial calibration, but will be deemed guilty of first degree murder for any homicide committed in the course thereof." (*People v. Burton* (1971) 6 Cal.3d 375, 388 [99 Cal.Rptr. 1, 491 P.2d 793].)

██ Consequently, a conviction of first degree felony murder does not require proof of a strict causal relationship between the underlying felony and the homicide so long as the killing and the felony are part of one continuous transaction. (*People v. Thompson* (1990) 50 Cal.3d 134, 171 [266 Cal.Rptr. 309, 785 P.2d 857]; *People v. Ainsworth* (1988) 45 Cal.3d 984, 1016 [248 Cal.Rptr. 568, 755 P.2d 1017]; *People v. Tapia* (1994) 25 Cal.App.4th 984, 1024 [30 Cal.Rptr.2d 851].)[12] "There is no requirement that the killing occur, 'while committing' or 'while engaged in' the felony, or that the killing be 'a

---

[12] The "continuous transaction" requirement in a felony-murder context was first articulated in California in *People v. Miller* (1898) 121 Cal. 343, 345 [53 P. 816]. The defendant tricked a woman into bringing Nellie Ryan, his former housekeeper, to the woman's house. When Ryan arrived and discovered Miller was inside, she left. Miller descended the stairs, exited the house, and immediately began shooting at Ryan, who ran across the street and entered the residence of James Childs. Miller attempted to pursue Ryan and had his hand on the door handle of the Childs residence when Childs "took hold of Miller." (*Id.* at pp. 344–345.) Miller immediately turned and shot Childs, killing him. (*Id.* at p. 345.) The Supreme Court rejected Miller's claim the trial court erred in instructing the jury regarding burglary, noting that section 189 applied to killings " 'committed in the perpetration, or attempt to perpetrate . . . burglary' " and entry with the intent to kill Ryan was sufficient. (*Miller, supra,* at pp. 346–347.) The court concluded, "The attempt to kill Nellie Ryan and the shooting of Childs were parts of one continuous transaction." (*Id.* at p. 345.)

In *People v. Boss* (1930) 210 Cal. 245 [290 P. 881], the defendant and an accomplice robbed a store. When an employee chased after the robbers, Boss shot and killed him. (*Id.* at pp. 247–248.) The defendants claimed the felony-murder rule did not apply because the killing took place after the robbery had been committed. (*Id.* at p. 250.) Relying on an opinion in another state with a similar felony-murder statute, the Supreme Court rejected that argument: "[W]here the enterprise is one continuous act including the carrying away of property, a murder committed by one of the defendants in flight 800 feet distant from the place of robbery in order to avoid apprehension is murder in the first degree . . . ." (*Id.* at p. 252.) The court noted the existence of burglary cases holding the crime is complete upon entry, but concluded the felony-murder rule "was adopted to make punishment of this class of crime more certain. It was not intended to relieve the wrongdoer from any . . . consequences of his act by placing a limitation upon the res gestae which is unreasonable or unnatural." (*Id.* at pp. 252–253, italics omitted; see *People v. Chavez* (1951) 37 Cal.2d 656, 670 [234 P.2d 632].) The res gestae of a crime includes not only the actual facts of the crime and the circumstances surrounding it, but also the acts immediately before and immediately after the crime that are "so closely connected with it as to form in reality a part of the occurrence." (*People v. Cipolla* (1909) 155 Cal. 224, 228 [100 P. 252]; see *State v. Jackson* (2005) 280 Kan. 541 [124 P.3d 460, 463] ["The felony-murder rule applies when the victim's death occurs within the res gestae of the underlying felony. [Citation.] Res gestae has been defined as those acts done before, during, or after the happening of the principal occurrence when those acts are so closely connected with the principal occurrence as to form, in reality, a part of the occurrence."]; *Parker v. State* (Fla. 1994) 641 So.2d 369, 376 [felony-murder rule applies in " ' "the absence of some definitive break in the chain of circumstances beginning with the felony and ending with the killing" ' "].)

part of' the felony, other than that the few acts be a part of one continuous transaction." (*People v. Stamp* (1969) 2 Cal.App.3d 203, 210 [82 Cal.Rptr. 598].) "As long as the homicide is the direct causal result of the [underlying felony] the felony-murder rule applies whether or not the death was a natural or probable consequence of the [underlying felony]." (*Ibid.*)

These concepts are covered in CALCRIM No. 540A, which attaches liability for felony murder if, among other things, "While committing [the underlying felony], the defendant caused the death of another person." (CALCRIM No. 540A.) This instruction also includes the following language: "It is not required that the person die immediately, as long as the cause of death and the [felony] are part of one continuous transaction." (*Ibid.*) Here, the trial court instructed the jury pursuant to CALCRIM No. 540A.[13] This was the proper instruction for this case because the prosecution alleged that Huynh committed the act causing the death. (Judicial Council of Cal., Crim. Jury Instns. (2012) Bench Notes to CALCRIM No. 540A, pp. 294–295.) Huynh does not claim the court erred by giving CALCRIM No. 540A.

*Instructions at Issue*

Huynh assigns error to the trial court's deletion of the following language from CALCRIM No. 730: "There was a logical connection between the act causing the death and the [underlying felony]. The connection between the fatal act and the [underlying felony] must involve more than just their occurrence at the same time and place."[14]

---

[13] In addition to CALCRIM No. 540A, the court gave the following pertinent instructions relating to felony murder: CALCRIM No. 549, which defined "one continuous transaction"; CALCRIM No. 620, which is a causation instruction; and CALCRIM No. 730, which deals with the special circumstance of murder in the commission of a felony (§190.2, subd. (a)(17)).

[14] CALCRIM No. 730, the standard instruction for the felony-murder special circumstance (§ 190.2, subd. (a)(17)), reads as follows: "The defendant is charged with the special circumstance of murder committed while engaged in the commission of [a felony]. [¶] To prove this special circumstance is true, the People must prove that: [¶] 1. The defendant committed [or] aided and abetted [the felony]; [¶] 2. The defendant . . . intended to commit [or] intended to aid and abet the perpetrator in committing [the felony]; [¶] 3. [The defendant] did an act that caused the death of another person; [¶] 4. The act causing the death and the [felony] were part of one continuous transaction; [and] [¶] 5. There was a logical connection between the act causing the death and [the felony]. The connection between the fatal act and [the felony] must involve more than just their occurrence at the same time and place. [¶] To decide whether . . . the defendant . . . and . . . the perpetrator . . . committed [the felony], please refer to the separate instructions that I . . . have given . . . you on . . . those . . . crime[s]. . . . To decide whether the defendant aided and abetted a crime, please refer to the separate instructions that I . . . have given . . . you on aiding and abetting. . . . You must apply those instructions when you decide whether the People have proved this special circumstance. [¶] . . . The defendant must have . . . intended to commit . . . or . . . aided and abetted [the

Huynh also claims the court erred by rejecting his special jury instruction, which read: "The felony-murder rule does not apply where the act resulting in death is completely unrelated to the underlying felony or felonies other than occurring at the same time and place; there must be a logical nexus, in other words, more than mere coincidence of time and place, between the felony or felonies and the act resulting in death."

Additionally, Huynh maintains the court's failure to instruct the jury with the following language from CALCRIM No. 240, the standard instruction on causation, was error: "An act [or omission] causes (injury/____<insert other description>) if the (injury/____<insert other description>) is the direct, natural, and probable consequence of the act [or omission] and the (injury/____<insert other description>) would not have happened without the act [or omission]. A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all the circumstances established by the evidence."[15]

*Analysis*

In this single-perpetrator felony-murder case, the trial court did not err by rejecting Huynh's request for instructions espousing these causation principles. Such causation principles are only pertinent in certain types of felony-murder cases. The first type involves more than one perpetrator—the so-called " ' "complicity aspect" ' " of the felony-murder rule. (*Cavitt, supra*, 33 Cal.4th at p. 196.) An example would be " 'a *nonkiller's* liability for the felony murder committed by another.' " (*Ibid.*) The second type is where other acts allegedly caused the death. (See *People v. Billa, supra*, 31 Cal.4th at p. 1072.)

However, our Supreme Court has made it clear that in a case such as this one, which involves a single perpetrator, application of the felony-murder rule lies outside the context of causation principles, such as proximate causation, natural and probable consequences and foreseeability. In other words, the felony-murder rule imposes a type of strict liability on the

---

felony] . . . before or at the time of the act causing the death . . . . [¶] . . . In addition, in order for this special circumstance to be true, the People must prove that the defendant intended to commit [the felony] independent of the killing. If you find the defendant only intended to commit murder and the commission of the [felony] was merely part of or incidental to the commission of that murder, then the special circumstance has not been proved. . . ."

[15] CALCRIM No. 240 also has language dealing with cases where there are multiple potential causes. The trial court instructed the jury with almost identical language: "There may be more than one cause of death. An act causes death only if it is a substantial factor in causing the death. A *substantial factor* is more than a trivial or remote factor. However, it does not need to be the only factor that causes the death." (CALCRIM No. 620.)

perpetrator acting on his or her own. "[F]irst degree felony murder encompasses a far wider range of individual culpability than deliberate and premeditated murder. It includes not only the latter, but also a variety of unintended homicides resulting from reckless behavior, or ordinary negligence, or pure accident; it embraces both calculated conduct and acts committed in panic or rage, or under the dominion of mental illness, drugs, or alcohol; and it condemns alike consequences that are highly probable, conceivably possible, or wholly unforeseeable." (*People v. Dillon* (1983) 34 Cal.3d 441, 477 [194 Cal.Rptr. 390, 668 P.2d 697].) "Once *a person* has embarked upon a course of conduct for one of the enumerated felonious purposes, he comes directly within a clear legislative warning—if a death results from his commission of that felony it will be first degree murder, regardless of the circumstances." (*People v. Burton, supra,* 6 Cal.3d at pp. 387–388, italics added.) Accordingly, the felony-murder rule generally does not require proof of a strict causal relationship between the underlying felony and the killing if there is one actor, and the felony and the killing are part of one continuous transaction.

Huynh principally relies on CALCRIM jury instructions that apply to felony-murder cases involving more than one perpetrator or present unusual situations. He points to CALCRIM Nos. 540B and 540C, both of which include language requiring a logical connection between the underlying felony and the killing: "There was a logical connection between the cause of death and the [underlying felony]. . . . The connection between the cause of death and the [underlying felony] must involve more than just their occurrence at the same time and place." (CALCRIM Nos. 540B, 540C.) This language is identical to the language in CALCRIM No. 730 which the court omitted, and is also similar to the language of Huynh's requested special jury instruction, which the court refused to give. CALCRIM No. 540C also contains causation language similar to the "natural and probable consequence" language of CALCRIM No. 240.

█ Huynh's reliance on CALCRIM Nos. 540B and 540C is misplaced because those instructions are intended for felony-murder cases that do not involve a single perpetrator. The drafters of the CALCRIM instructions advise CALCRIM No. 540B applies to felony-murder cases in which a coparticipant committed the killing. (Judicial Council of Cal., Crim. Jury Instns., *supra,* Introduction to Felony-Murder Series, at pp. 291–292.) The drafters also advise CALCRIM No. 540C applies to felony-murder cases, involving "unusual factual situations where a victim dies during the course of a felony as a result of a heart attack, a fire, or a similar cause, rather than as a result of some act of force or violence committed against the victim by one of the participants." (Judicial Council of Cal., Crim. Jury Instns., *supra,* Introduction to Felony-Murder Series, at p. 291.)

Thus, Huynh is attempting to graft onto this single-perpetrator felony-murder case instructional requirements meant for the " ' "complicity aspect" ' " of the felony-murder rule (*Cavitt, supra*, 33 Cal.4th at p. 196), or cases in which a person dies during commission of a felony but as a result of other causes. (Judicial Council of Cal., Crim. Jury Instns., *supra*, Introduction to Felony-Murder Series, at pp. 291–292; see *People v. Billa, supra*, 31 Cal.4th at p. 1072 [arson causing death of accomplice]; *People v. Stamp, supra*, 2 Cal.App.3d at pp. 209–211 [heart attack caused by robbery].) Such instructional requirements are not appropriate where, as here, the victim died in the course of felony conduct perpetrated by a defendant acting on his own.

For similar reasons the court did not err in refusing to instruct pursuant to CALCRIM No. 240. The natural and probable consequences theory of causation was not relevant to the legal principles applicable in this case. (*People v. Chavez, supra*, 37 Cal.2d at p. 669; *People v. Stamp, supra*, 2 Cal.App.3d at p. 210.) Likewise, the Bench Note to CALCRIM No. 540A, which states the court has a sua sponte duty to give CALCRIM No. 240 if causation is an issue (Judicial Council of Cal., Crim. Jury Instns., *supra*, Bench Notes to CALCRIM No. 540A, p. 294), is misleading as the instruction does not apply where death results during felony conduct undertaken by a single perpetrator.

### IV.–VI.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### VII. *Refusal to Instruct on Second Degree Murder*

Huynh contends the trial court erred by refusing to instruct on the lesser included offense of second degree implied malice murder based principally on (1) a notice argument involving the charging document and (2) an argument that the enumerated felonies in section 189 are inherently dangerous to life or pose a significant prospect of violence, and, therefore, the commission of such felonies involve implied malice. The contention is without merit.

*Notice*

 "Under California law, a lesser offense is necessarily included in a greater offense if either the statutory elements of the greater offense, or the facts actually alleged in the accusatory pleading, include all the elements of the lesser offense, such that the greater cannot be committed without also

---

*See footnote, *ante*, page 285.

committing the lesser." (*People v. Birks* (1998) 19 Cal.4th 108, 117 [77 Cal.Rptr.2d 848, 960 P.2d 1073].) In his notice argument, Huynh relies on the accusatory pleading test, which is satisfied if the charging allegations include language describing the offense in such a way that if committed as specified the lesser offense is necessarily committed. (*People v. Lopez* (1998) 19 Cal.4th 282, 288 [79 Cal.Rptr.2d 195, 965 P.2d 713].) The accusatory pleading test is met if the greater offense cannot be committed without also committing the lesser offense. (*People v. Birks, supra*, at p. 117.)

Count 1 of the information charged Huynh with murder: "On or about and between January 26, 2008 and January 29, 2008, PHILONG N. HUYNH did unlawfully murder DANE WILLIAMS, a human being, in violation of PENAL CODE SECTION 187(a)." In connection with count 1, the information also alleged two special circumstances: "And it is further alleged that the murder of DANE WILLIAMS was committed by defendant PHILONG N. HUYNH while the said defendant was engaged in the commission and attempted commission of the crime of Oral Copulation, in violation of Penal Code section 288a, within the meaning of PENAL CODE SECTION 190.2(a)(17) [¶] . . . [¶] . . . And it is further alleged that the murder of DANE WILLIAMS was committed by defendant PHILONG N. HUYNH while the said defendant was engaged in the commission and attempted commission of the crime of Sodomy, in violation of Penal Code section 286, within the meaning of PENAL CODE SECTION 190.2(a)(17)."

Notwithstanding the reference to section 187 in the information, the prosecution's case was tried strictly on a first degree felony-murder theory. At the end of the evidentiary portion of the trial, the court remarked: "And the People have indicated consistently throughout the history of this case since it has been assigned to this department, which I believe goes back to November of last year, if I recall correctly, the sole theory of the People's case was the felony[-]murder rule."

Relying on *People v. Anderson* (2006) 141 Cal.App.4th 430 [45 Cal.Rptr.3d 910] (*Anderson*), Huynh claims he was entitled to instruction on second degree murder because he was charged under section 187. "[T]he role of the accusatory pleading is to provide notice to the defendant of the charges that he or she can anticipate being proved at trial. 'When an accusatory pleading alleges a particular offense, it thereby demonstrates the prosecution's intent to prove all the elements of any lesser necessarily included offense. Hence, the stated charge notifies the defendant, for due process purposes, that he must also be prepared to defend against any lesser offense necessarily included therein, even if the lesser offense is not expressly set forth in the indictment or information.' " (*Anderson, supra*, at p. 445, quoting *People v. Birks, supra*, 19 Cal.4th at p. 118.)

In *Anderson, supra,* 141 Cal.App.4th at pages 436 to 437, the female defendant was in a motel room when her male friend (codefendant) and the room's occupant (victim) began fighting. The victim started the fight by accusing the codefendant of selling him poor quality or fake crack cocaine. (*Id.* at p. 436.) In the course of the fight, the defendant attempted to disarm the victim of a broken crack pipe, which he had used to cut the codefendant's face. (*Id.* at p. 437.) The codefendant maintained an armlock around the victim's neck and the two of them fell to the floor. (*Ibid.*) The codefendant told the defendant to get the money from the victim, which she did. (*Ibid.*) By this time, the victim had stopped struggling and subsequently died. (*Ibid.*)

The defendant in *Anderson, supra,* 141 Cal.App.4th at page 435, was charged in an amended information with one count of murder pursuant to section 187, subdivision (a). The language in this accusatory pleading stated the defendant " 'did unlawfully, and with malice aforethought, murder . . . .' " (*Anderson, supra,* at p. 445.) After the close of evidence, the trial court allowed the prosecution to orally amend the first amended information to " 'add' " a charge of felony murder. (*Id.* at pp. 435, 445.) However, the defendant was never charged with the predicate offense for the felony murder. (*Id.* at p. 445.) The Court of Appeal held the trial court should have given a second degree murder instruction as a lesser included offense of the charged murder count (§ 187, subd. (a)) because the "defendant was on notice that she might be convicted of that crime or any of its lesser included offenses . . . ." (*Anderson, supra,* at p. 445.)[19]

On the notice issue, we find *Anderson* clearly distinguishable from this case. In *Anderson,* the prosecution tried the case on both a felony-murder theory and a theory of malice aforethought; here, the prosecution's case was based solely on the felony-murder rule. Although both the first amended information in *Anderson* and the information in Huynh's case referenced section 187, subdivision (a), only the accusatory pleading in *Anderson* included "malice aforethought" language. The accusatory pleading in this case did not have "malice aforethought" language. Also in *Anderson,* the defendant was not charged at any point with the predicate felony to support the felony-murder theory while Huynh was charged with the predicate felonies of oral copulation and sodomy. Additionally, the special circumstances attached to Huynh's murder count provided him with at least implicit notice that the prosecution was proceeding under a felony-murder theory. Finally, Huynh knew from the get-go that his case was being prosecuted only on a felony-murder theory because the prosecution made the theory of the case clear well in advance of the trial. In *Anderson,* the felony-murder theory did not become apparent until after the trial began.

---

[19] The *Anderson* court held the defendant also was entitled to an instruction on the lesser included offense of voluntary manslaughter. (*Anderson, supra,* 141 Cal.App.4th at p. 445.)

*Implied Malice Theory Based on Inherently Dangerous Felonies*

Second degree murder is a lesser included offense of first degree murder committed with malice aforethought. (*People v. Taylor* (2010) 48 Cal.4th 574, 623 [108 Cal.Rptr.3d 87, 229 P.3d 12].) This is so because second degree murder is the unlawful killing of a human being with malice—either express or implied—but without premeditation and deliberation. (*Ibid.*) "Malice will be implied 'when the killing results from an intentional act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' " (*Id.* at pp. 623–624.) Conversely, malice is not involved in first degree felony murder.

Huynh has not cited any authority for his proposition that second degree murder is a lesser included offense of first degree felony murder. Our Supreme Court has left open the question. (*People v. Taylor, supra*, 48 Cal.4th at p. 623; *People v. Romero* (2008) 44 Cal.4th 386, 402 [79 Cal.Rptr.3d 334, 187 P.3d 56]; *People v. Wilson* (2008) 43 Cal.4th 1, 16, fn. 5 [73 Cal.Rptr.3d 620, 178 P.3d 1113]; *People v. Valdez* (2004) 32 Cal.4th 73, 114, fn. 17 [8 Cal.Rptr.3d 271, 82 P.3d 296].)

However, "[w]here the evidence points indisputably to a killing committed in the perpetration of one of the felonies section 189 lists, the *only* guilty verdict a jury may return is first degree murder. . . . Under these circumstances, a trial court 'is justified in withdrawing' the question of degree 'from the jury' and instructing it that the defendant is either not guilty, or is guilty of first degree murder. . . . The trial court also need not instruct the jury on offenses other than first degree felony murder or on the differences between the degrees of murder. . . . Because the evidence establishes as a matter of law that the murder is of the first degree, these procedures violate neither the right under section 1126 to have a jury determine questions of fact . . . nor the constitutional right to have a jury determine every material issue the evidence presents." (*People v. Mendoza* (2000) 23 Cal.4th 896, 908–909 [98 Cal.Rptr.2d 431, 4 P.3d 265], citations omitted.)

Nonetheless, Huynh relies on the following reasoning: "Because all of the felonies enumerated in section 189 which are predicates to first degree felony murder are [either] 'inherently dangerous to life or pose a significant prospect of violence,' . . . there is no way that one can commit felony murder, and not also be guilty of the lesser included offense of second degree implied malice murder." The problem with such reasoning in this case is twofold. First, sodomy *of an intoxicated person* and/or oral copulation *of an intoxicated person* are not inherently dangerous to life and/or do not pose a significant

prospect of violence. Second, there was no evidence that Huynh knew his conduct endangered the life of Williams and nonetheless acted with conscious disregard for life.[20] Furthermore, Huynh's reasoning would lead to an absurd result—namely, that an instruction on second degree implied malice murder would be required in every felony-murder trial.

Finally, we note a second degree murder instruction was not warranted because there was no substantial evidence that the killing was other than a murder committed in the perpetration of sodomy and oral copulation. There was no evidence of implied malice.

In any event, even if the evidence would have supported a charge of second degree murder, the failure to give such an instruction was harmless because the jury's true findings on the special circumstance allegations establish the jury found Huynh guilty of first degree felony murder. "Because 'the elements of felony murder and the special circumstance[s] coincide, the true finding[s] as to the . . . special circumstance[s] establish[ ] here that the jury would have convicted [Huynh] of first degree murder under a felony-murder theory, at a minimum, regardless of whether more extensive instructions were given on second degree murder. [Citations.]' [Citation.] Therefore, the jury necessarily found [Huynh] guilty of first degree felony murder, and any error in not instructing the jury concerning second degree murder was harmless beyond a reasonable doubt." (*People v. Castaneda* (2011) 51 Cal.4th 1292, 1328 [127 Cal.Rptr.3d 200, 254 P.3d 249].)

## VIII. *Failure to Instruct on Involuntary Manslaughter**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## IX. *Sixth Amendment Implications of Surrogate Nurse's Testimony*

Huynh contends the trial court violated his Sixth Amendment right to confront witnesses by allowing a nurse to testify about Jeremiah's sexual assault examination conducted by another nurse. The contention is without merit.

### Background

At the time of trial, Danella Kawachi, the registered nurse who conducted a SART examination on Jeremiah on June 8, 2009, was unavailable because

---

[20] However, if Huynh in a subsequent similar sexual encounter with an intoxicated person killed that person, he would have knowledge that his felonies endangered the life of his victim and nonetheless acted with conscious disregard for life.

* See footnote, *ante*, page 285.

she was awaiting a heart transplant. The trial court, over the objection of Huynh, allowed the prosecution to present the testimony of Claire Nelli, a registered nurse who was Kawachi's supervisor and employer.

Nelli testified she and Kawachi are forensic nurses certified to perform sexual assault examinations of victims and suspects. Nelli is the owner of one of the SART facilities in San Diego and personally reviews all reports and photographs taken during examinations in her facility. Nelli explained to the jury how SART examinations are performed according to a state protocol, which, among other things, calls for photographs to be taken to document the nurse's findings. During Nelli's testimony, she reviewed two photographs from the SART examination of Jeremiah's anus and rectum and stated her independent opinion—based on her experiences examining more than 1,000 anuses during the course of 2,000 SART examinations—that the photographs showed significant trauma to the anus. Nelli did not describe to the jury Kawachi's findings and opinions regarding the examination and Jeremiah's injuries.

*Legal Principles*

In *Crawford v. Washington* (2004) 541 U.S. 36, 59 [158 L.Ed.2d 177, 124 S.Ct. 1354] (*Crawford*), the United States Supreme Court held that the Sixth Amendment's confrontation clause prohibits admission of out-of-court "[t]estimonal statements of witnesses absent from trial [unless] the declarant is unavailable," and "only where the defendant has had a prior opportunity to cross-examine." The *Crawford* court did not set forth "a comprehensive definition" of what constitutes "testimonial evidence," but held that "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." (541 U.S. at p. 68.) Elaborating to some degree, the *Crawford* court also stated the "core class" of testimonial statements included " 'ex parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially,' . . . 'extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions,' . . . 'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.' " (*Id.* at pp. 51–52, citations & italics omitted.)

Subsequently, the high court addressed what constituted testimonial statements in *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305 [174 L.Ed.2d 314, 129 S.Ct. 2527] (*Melendez-Diaz*); *Bullcoming v. New Mexico* (2011)

564 U.S. ___ [180 L.Ed.2d 610, 131 S.Ct. 2705] (*Bullcoming*); and *Williams v. Illinois* (2012) 567 U.S. ___ [183 L.Ed.2d 89, 132 S.Ct. 2221] (*Williams*).

In *Melendez-Diaz, supra*, 557 U.S. at pages 308 through 309, a drug case, the prosecution introduced " 'certificates of analysis' " prepared by laboratory analysts who did not testify; the certificates reported that a substance found in the defendant's car was cocaine. The Supreme Court held the certificates were "within the 'core class of testimonial statements,' " and, therefore, their use violated the defendant's Sixth Amendment rights under *Crawford*. (*Melendez-Diaz, supra*, at p. 310.) Each certificate was a " ' "solemn declaration or affirmation made for the purpose of establishing or proving some fact[,]" ' . . . functionally identical to live, in-court testimony . . . [¶] . . . ' "made under circumstances which would lead an objective witness reasonably to believe that the *statement would be available for use at a later trial*," '. . . [and created] to provide 'prima facie evidence of the composition, quality, and the net weight' of the analyzed substance." (*Id.* at pp. 310–311.)

In *Bullcoming, supra*, 564 U.S. ___ [131 S.Ct. 2705], a drunk driving case, the high court again held that a laboratory analyst's certificate was a testimonial statement that could not be introduced unless the analyst was unavailable for trial and the defendant had a prior opportunity to confront that witness. (*Id.* at pp. ___, ___ [131 S.Ct. at pp. 2710, 2713].) The defendant's blood sample was sent to a state laboratory for testing after he was arrested for drunk driving. (*Id.* at p. ___ [131 S.Ct. at p. 2710].) The analyst who tested the defendant's blood sample recorded the results on a state form that included a " 'certificate of analyst.' " (*Ibid.*) At trial, the analyst who tested his blood sample did not testify, but a colleague familiar with the laboratory's testing protocol testified. (*Id.* at pp. ___–___ [131 S.Ct. at pp. 2711–2712].)

The *Bullcoming* court explained that another analyst who did not participate in or observe the test on the defendant's sample was an inadequate substitute or surrogate for the analyst who performed the test. (*Bullcoming, supra*, 564 U.S. at p. ___ [131 S.Ct. at p. 2715].) Testimony by someone who qualified as an expert regarding the machine used and the laboratory's procedures "could not convey what [the actual analyst] knew or observed about the events his certification concerned, *i.e.*, the particular test and testing process he employed" and would not expose "any lapses or lies on the certifying analyst's part." (*Ibid.*) The high court stated that, if the Sixth Amendment is violated, "no substitute procedure can cure the violation . . . ." (*Id.* at p. ___ [131 S.Ct. at p. 2716].) The high court reiterated the principle stated in *Melendez-Diaz* that a document created solely for an evidentiary purpose in aid of a police investigation is testimonial. (*Bullcoming, supra*, 564 U.S. at p. ___ [131 S.Ct. at p. 2717].) Even though the analyst's certificate was not signed under oath, as occurred in *Melendez-Diaz*, the two

documents were similar in all material respects. (*Bullcoming, supra*, 564 U.S. at p. ___ [131 S.Ct. at p. 2717].)

Earlier this year, in *Williams, supra*, 567 U.S. ___ [132 S.Ct. 2221], a rape case, the high court considered a forensic DNA expert's testimony that the DNA profile, which was derived from semen on vaginal swabs taken from the victim and produced by an outside laboratory, matched a DNA profile derived from the suspect's blood and produced by the state police laboratory. Justice Alito, writing with the concurrence of three justices and with Justice Thomas concurring in the judgment, concluded that the expert's testimony did not violate the defendant's confrontation rights. The plurality held that the outside laboratory report, which was not admitted into evidence (*id.* at pp. ___, ___ [132 S.Ct. at pp. 2230, 2235]), was "basis evidence" to explain the expert's opinion, was not offered for its truth, and therefore did not violate the confrontation clause. (567 U.S. at pp. ___–___ [132 S.Ct. at pp. 2239–2240].) The plurality also supplied an alternative theory: even if the report had been offered for its truth, its admission would not have violated the confrontation clause because the report was not a formalized statement made primarily to accuse a targeted individual. (567 U.S. at pp. ___–___ [132 S.Ct. at pp. 2242–2244].) Applying an objective test in which the court looks "for the primary purpose that a reasonable person would have ascribed to the statement, taking into account all of the surrounding circumstances" (*id.* at p. ___ [132 S.Ct. at p. 2243]), the *Williams* plurality found that the primary purpose of the outside laboratory report "was to catch a dangerous rapist who was still at large, not to obtain evidence for use against [the defendant], who was neither in custody nor under suspicion at that time." (*Ibid.*) Further, the plurality found that no one at the outside laboratory could have possibly known that the profile it generated would result in inculpating the defendant, and, therefore, there was no prospect for fabrication and no incentive for developing something other than a scientifically sound profile. (*Id.* at pp. ___–___ [132 S.Ct. at pp. 2243–2244].) Justice Thomas concurred on the basis the report lacked the requisite formality and solemnity to be testimonial. (*Id.* at p. ___ [132 S.Ct. at p. 2255] (conc. opn. of Thomas, J.).)

Most recently, the California Supreme Court in a trio of cases reexamined the meaning of "testimonial" within the context of the Sixth Amendment right to confront an adverse witness in light of the United States Supreme Court's decisions in *Crawford, Melendez-Diaz, Bullcoming*, and *Williams*. (*People v. Lopez* (2012) 55 Cal.4th 569 [147 Cal.Rptr.3d 559, 286 P.3d 469]; *People v. Dungo* (2012) 55 Cal.4th 608 [147 Cal.Rptr.3d 527, 286 P.3d 442]; *People v. Rutterschmidt* (2012) 55 Cal.4th 650 [147 Cal.Rptr.3d 518, 286 P.3d 435].)

Of the trio of cases by the California Supreme Court, *People v. Dungo, supra*, 55 Cal.4th 608 (*Dungo*), a murder case, is the one that is most pertinent here. Rather than calling Dr. George Bolduc, the pathologist who performed the autopsy, the prosecution chose to present the expert testimony of Dr. Robert Lawrence, another forensic pathologist who was Dr. Bolduc's employer. (*Dungo, supra*, 55 Cal.4th at p. 613.) Dr. Lawrence testified that after reviewing the autopsy report and the accompanying autopsy photographs, he concluded the victim had died from asphyxia caused by strangulation, noting the victim had " 'hemorrhages in the neck organs consistent with fingertips during strangulation' " and " 'pinpoint hemorrhages in her eyes,' " which indicated a lack of oxygen. (*Id.* at p. 614.) Dr. Lawrence told the jury that his opinion the cause of death was strangulation also was supported by " 'the purple color of [the victim's] face,' " the victim's biting of her tongue just before death, and the " 'absence of any natural disease that can cause death.' " (*Ibid.*) Dr. Lawrence also testified the victim was strangled for " 'more than two minutes' " because her hyoid bone was not fractured. (*Ibid.*)[21] Dr. Lawrence said the victim's death could have occurred sooner if the hyoid bone had been fractured. (55 Cal.4th at p. 614.)

In determining whether Dungo's right to confront witnesses against him was violated by Dr. Lawrence's testimony, the *Dungo* court focused on two of the "critical components" of the word "testimonial" in this context. (*Dungo, supra*, 55 Cal.4th at p. 619.) "First, to be testimonial the statement must be made with some degree of formality or solemnity. Second, the statement is testimonial only if its primary purpose pertains in some fashion to a criminal prosecution." (*Ibid.*)

Regarding the formality or solemnity aspect, the *Dungo* court held the autopsy and accompanying photographs were not so formal and solemn as to be considered testimonial for purposes of the Sixth Amendment's confrontation right. (*Dungo, supra*, 55 Cal.4th at p. 621.)[22] The *Dungo* court noted Dr. Lawrence testified about objective facts concerning the condition of the victim's body as recorded in an autopsy report and accompanying photographs, and did not testify about the conclusions in the report. (*Dungo*, at p. 619.) "[S]tatements . . . which merely record objective facts . . . are less formal than statements setting forth a pathologist's expert conclusions. They

---

[21] The record on appeal did not indicate whether Dr. Lawrence based his opinion solely on the autopsy photographs, solely on Dr. Bolduc's autopsy report, or on a combination of the two. (*Dungo, supra*, 55 Cal.4th at pp. 614–615.)

[22] Justice Werdegar, who signed the majority opinion, noted in a concurring opinion: "The process of systematically examining the decedent's body and recording the resulting observations is thus one governed primarily by *medical* standards rather than by legal requirements of formality or solemnity." (*Dungo, supra*, 55 Cal.4th at p. 624 (conc. opn. of Werdegar, J.).)

are comparable to observations of objective fact in a report by a physician who, after examining a patient, diagnoses a particular injury or ailment and determines the appropriate treatment. Such observations are not testimonial in nature. (*Melendez-Diaz, supra*, 557 U.S. at p. 312, fn. 2 ['medical reports created for treatment purposes . . . would not be testimonial under our decision today'].)" (*Dungo, supra*, at pp. 619–620.) ". . . Dr. Lawrence's description to the jury of objective facts about the condition of [the] victim['s] body, facts he derived from Dr. Bolduc's autopsy report and its accompanying photographs, did not give defendant a right to confront and cross-examine Dr. Bolduc." (*Id.* at p. 621.)

The *Dungo* court also found the autopsy report and accompanying photographs did not satisfy the second critical component of being testimonial—namely, having a primary purpose that "pertains in some fashion to a criminal prosecution." (*Dungo, supra*, 55 Cal.4th at pp. 619, 621.) The *Dungo* court noted autopsies are performed for a variety of purposes, and criminal investigation is only one of several objectives. (*Id.* at p. 621.)

*Analysis*

At issue here are the two photographs that Kawachi took during her SART examination of Jeremiah that were used by Nelli to state her independent opinion, and whether Huynh's Sixth Amendment right was violated because he was not able to confront and cross-examine Kawachi.

These photographs, like the autopsy report and accompanying photographs in *Dungo* (see fn. 21, *ante*), depicted objective facts about the condition of Jeremiah's body. The photographs by themselves did not set forth Kawachi's conclusions or opinions about the results of the SART examination. "They are comparable to observations of objective fact in a report by a physician who, after examining a patient, diagnoses a particular injury or ailment and determines the appropriate treatment. Such observations are not testimonial in nature." (*Dungo, supra*, 55 Cal.4th at p. 619.) The two SART examination photographs lacked the formality and solemnity that are a requirement of being testimonial. Therefore, Nelli's testimony stating objective facts about the condition of Jeremiah's body—facts she derived from the photographs that Kawachi took during the SART examination—did not give Huynh the right to confront and cross-examine Kawachi.

As to the *Dungo* court's second critical component of "testimonial" in this context—namely, whether the primary purpose pertains in some fashion to a criminal prosecution—we also conclude the photographs from the SART

examination did not meet the test. Although SART examinations generally are more closely linked to criminal investigations than autopsies, the primary purpose of a particular SART examination is not necessarily for use in a criminal investigation. In this case, for example, when Jeremiah returned to Camp Pendleton, he did not know what had happened to him during the weekend. The SART examination was performed to determine if he was the victim of a sexual assault. In this regard, the plurality opinion in *Williams, supra,* 567 U.S. ___ [132 S.Ct. 2221] is instructive.

The *Williams* plurality found the purpose of the DNA profile, which was produced by the outside laboratory before any suspect had been identified, was to "find[] a rapist who was on the loose." (*Williams, supra,* 567 U.S. at p. ___ [132 S.Ct. at p. 2228] (plur. opn. of Alito, J.).) Thus, the "primary purpose" was *not* to "accus[e] a targeted individual of engaging in criminal conduct." (*Id.* at pp. ___, ___ [132 S.Ct. at pp. 2242, 2243].) "In identifying · the primary purpose of an out-of-court statement, we apply an objective test. [Citation.] We look for the primary purpose that a reasonable person would have ascribed to the statement, taking into account all of the surrounding circumstances." (*Id.* at p. ___ [132 S.Ct. at p. 2243].)

When Jeremiah's SART examination took place in June 2009, there was no criminal investigation of Huynh; Huynh did not become a suspect until September. The photographs of the anus and rectum depicted the condition of these areas and were taken to document whether Jeremiah was sodomized. The primary purpose of the photographs that Nelli relied on was to show the condition of the body. In taking the photographs, there was no likelihood of falsification and no motivation to produce anything other than a reliable depiction of Jeremiah's injuries, if any. The photographs were not taken for the primary purpose of accusing a targeted individual. Therefore, Nelli's use of the photographs was not testimonial and did not violate Huynh's right to confront and cross-examine the photographer (Kawachi).

Huynh's Sixth Amendment right was not violated by Nelli's testimony.[23]

## X.–XII.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[23] We also do not read *Crawford* and its progeny as standing for the proposition that expert witnesses are no longer permitted to testify about their expert opinions on relevant matters based on photographs and reports prepared by others.

*See footnote, *ante*, page 285.

## DISPOSITION

The judgment is affirmed.

Huffman, Acting P. J., and Irion, J., concurred.

Appellant's petition for review by the Supreme Court was denied April 10, 2013, S208162.