Filed 7/1/14

CERTIFIED FOR PARTIAL PUBLICATION[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E055528 |
| v. | (Super.Ct.No. RIF10003985) |
| AARON ROBERT CAMPBELL et al., | O P I N I O N |
| Defendants and Appellants. | |

APPEAL from the Superior Court of Riverside County. W. Charles Morgan, Judge. Affirmed with directions.

Steven Schorr, under appointment by the Court of Appeal, for Defendant and Appellant Xavier James Fort.

Laura Schaefer, under appointment by the Court of Appeal, for Defendant and Appellant Aaron Robert Campbell.

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts III.B, III.C, and III.D.

1

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, and Steve Oetting and Lise S. Jacobson, Deputy Attorneys General, for Plaintiff and Respondent.

## I.  INTRODUCTION

Defendant and appellant Aaron Robert Campbell met Silvester Leyva at a hookah bar where they exchanged telephone numbers and discussed buying and selling marijuana.  A few days later, Campell and defendant and appellant Xavier James Fort, among others, went to Leyva's house to obtain marijuana.  Leyva and his friend, Samuel De La Torre, met Campbell in Leyva's front yard.  After De La Torre handed marijuana to Campbell, Campbell pulled a gun and began to back away toward two waiting vehicles.  Fort, who was standing near the vehicles, fired his gun in the direction of the house.  Leyva was killed by one of the bullets.

A jury convicted defendants of first degree murder and found true a robbery special-circumstance allegation.  The jury also convicted them of two counts of robbery based upon the taking of the marijuana.  In one robbery count, Leyva was the victim; in the other, De La Torre was the victim.

Regarding the murder charge, the jury was instructed on first degree felony murder only, with robbery as the underlying felony.  On appeal, Fort argues that, based on the accusatory pleading, the trial court had a sua sponte duty to instruct on lesser included offenses.  We agree.  Moreover, there was substantial evidence from which a

2

reasonable jury could conclude that a lesser offense, but not the greater, was committed. Therefore, the court erred by failing to instruct the jury as to lesser included offenses.

In the nonpublished portion of our opinion we hold that the instructional error was harmless, and we reject defendants' argument that the evidence was insufficient to support their convictions of the robbery of Leyva. We also conclude that the court's stay of a sentence enhancement term as to Fort constituted an unauthorized sentence, which we correct.

## II. FACTS

A. *Prosecution Evidence*

### 1. De La Torre's Trial Testimony

De La Torre testified to the following. He had known Leyva for about four to six months before the incident. On the evening of the incident, he arrived at Leyva's house between 10:00 p.m. and 10:30 p.m. There were 10 to 15 people present. The garage door was open and there was no power on in the house.

De La Torre brought marijuana and intended "[j]ust to hang out, smoke." De La Torre owned and possessed the marijuana. He did not plan to sell the marijuana. When he and Leyva were in the backyard smoking and drinking, someone informed them that some men were out front looking to buy marijuana, and that they had been texting or calling Leyva. After talking with Leyva, De La Torre took the marijuana out front to sell.

When De La Torre got out front, there were three African-American males asking about marijuana. De La Torre had never seen them before. De La Torre took one bud of

3

marijuana out to show them. During this encounter, both he and Leyva were involved in the conversation. De La Torre did the negotiating while Leyva watched. However, De La Torre said he thought that when the prospective buyer asked for the price, Leyva "maybe threw a number out there . . . ."

At some point, Leyva said the price should be around $550 for two ounces, but De La Torre said he wanted to get $600. De La Torre testified that he did not want to sell it for $550 because Leyva "wanted to make some money or something, so I was helping him out." (The record is not clear as to whether this discussion with Leyva took place before Leyva and De La Torre met the men in the front yard or in the presence of those men.)

The man seeking to buy the marijuana said he did not bring any money and had to go to an ATM. He and the other men left in a red Honda Accord. After they left, the garage door was closed and everyone at Leyva's house went inside. There were no lights on in the house or on the front porch. In the house, Levya, De La Torre, and others continued smoking marijuana and consuming alcohol.

After about 20 minutes, the red Honda and a silver Chevrolet Malibu or Impala pulled up in front of the house. Looking through the front window, De La Torre observed four or five people get out of the silver car and three get out of the red car. The individuals spread out about an arm's length apart at the sidewalk area. A few of them were on the sidewalk and a few in the street. Around this time, Leyva received a telephone call or text message.

4

After waiting about two minutes, De La Torre walked outside. Leyva and others were behind De La Torre. De La Torre believed the men outside the house intended to take the marijuana against his will. He decided he would give them the marijuana without putting up a fight because he did not want any problems. However, he left the marijuana in an office inside the house.

Leyva asked for the person he had met a few days earlier. An individual with orange hair approached and said he was looking for marijuana and had the money. Leyva was "doing the talking." The conversation occurred on the walkway between the garage and the front door. As Leyva and the ostensible buyer talked, De La Torre went into the house to get the marijuana. When he came back outside, Leyva was still talking with the individual.

When De La Torre held out the bag of marijuana, the man grabbed it and asked if it was all there. De La Torre said it was. The man then stepped back, pulled a gun, cocked it, and told everybody to go back into the house. He said something like: "[D]on't do anything stupid." De La Torre and his friends put their hands up and walked backwards. As he turned to walk into the house, Leyva crossed his path and yelled something like: "I know you guys's homie." He then heard three shots. Leyva was hit. De La Torre did not see anybody firing the shots.

2. Police Interview of Campbell

Leyva's death was investigated by Gary Bowen, a special investigator with the Riverside County Sheriff's Department homicide unit. Bowen found four text messages

5

on Leyva's telephone sent from Campbell's telephone on the day of the shooting at 11:14 p.m., 11:15 p.m., 11:47 p.m., and 11:48 p.m. Bowen interviewed Campbell the day after the shooting. Campbell had orange-tinted hair.

Campbell told Bowen that he met a Hispanic male at a hookah lounge in the City of Riverside. He got the man's telephone number for the purpose of conducting marijuana transactions. Thereafter, and on the evening of the incident, Campbell planned to obtain marijuana from the person he met at the hookah bar by "tak[ing] it from him."

Campbell set up the transaction via text earlier in the evening before the first visit to Leyva's house. When he later returned to the house, the garage door was closed. He sent a text message to Leyva to get him to come outside. Campbell had a gun with him and said he used the gun. He did not know that anyone else had a gun.

Leyva and De La Torre met Campbell outside Leyva's house. When De La Torre produced the marijuana, Campbell took the marijuana with his right hand. He pulled out his gun with his left hand and pointed it at De La Torre and Leyva. He said: "[D]on't do anything stupid." Campbell then got back into his vehicle before any shots were fired.

3. Terence Harris

Harris was in custody as a result of the incident. He testified that two days before the shooting, he and Campbell were at a hookah bar. Campbell and a Hispanic man talked and exchanged telephone numbers.

On the evening of the shooting, Harris was at "J.B.'s" house, hanging out with people who wanted to smoke marijuana. Campbell, Thurston Stewart, Kelton Pounds,

6

and Christian Baker were there, among others. Fort was not there. Campbell said he knew where they could get some marijuana.

Harris, Campbell, Pounds, and Baker discussed a plan to go to Leyva's house, "snatch the marijuana and run." When they arrived at Leyva's house, the garage door was open. Pounds talked with individuals in the garage for about five minutes while the other three stood at the end of the driveway. Pounds was shown marijuana. They did not take the marijuana at that time because there were too many people present.

When they got back to J.B.'s house, the group discussed a plan to return to Leyva's house with more people and steal the marijuana, with "some bit of force" if necessary. Harris knew that Baker and Campbell had guns. They discussed getting another gun. Stewart said his "cousin," Fort, had a gun.

They went to pick up Fort. Harris knew Fort was coming along "to provide a gun." After picking up Fort, they went back to Leyva's house. Harris initially testified that he did not remember if, after Fort got in the car, there was any conversation about what they were going to do at Leyva's house. He later testified that after Fort got in the car there was a discussion about committing the robbery.

They took two cars to Leyva's house. When they arrived, six people got out of the cars. Someone shouted to the people in the house to come outside. They waited for five or 10 minutes before some people came outside. Campbell talked to them. An individual handed Campbell a bag and Campbell passed it to Harris. Campbell then pulled out a gun. As Campbell and Harris were running to the cars, Harris heard somebody from the

7

other group yell something.  After getting into a car, he heard two gunshots.  He did not see anyone shooting.

Fort got into the car Harris was in.  He had a gun in his hand.  This was the first time that evening that Harris saw Fort's gun.  Fort opened the gun's cylinder and looked at the bullets.  Fort said the gun did not shoot, and he seemed surprised that the gun had not gone off.  When they got back to J.B.'s house, Fort looked at the gun again and realized it had fired.

Harris did not know what Fort was doing during the incident.  The last time he saw Fort before the shooting, Fort was leaning on a fire hydrant across the street from Leyva's house.

4. Police Interview of Fort

Bowen interviewed Fort.  During the interview, Fort indicated that on the evening of the shooting he received a call from Stewart about "hang[ing] out."  Stewart indicated there would be "loads of grams."  Fort understood that there was going to be a "lick" or a robbery and they were "going to rip off some weed."[1]  He told Bowen:  "They was [*sic*]

---

[1] During the cross-examination of Bowen, relative to Fort's understanding that it would be a "lick," or robbery, the following testimony appears:
"Q  ([DEFENSE COUNSEL])  He said that he just had a feeling.  He just knew something was up.
"A  Yes.  'So I had a feeling something was up, so I just took it, and we went over there.'  Referring to his gun.
"Q  So he never tells you at that point in time that he knows there's going to be this robbery at Mr. Leyva's house; right?
"A  Well, the next line where I ask him if he's going to do a lick, 'Something, I just knew something was up.'

*[footnote continued on next page]*

selling weed, so they—so they probably could have come out with stuff, come out with guns themselves." He took with him a .357-caliber revolver. No one told him to bring his gun; it was his own decision.

After arriving at Leyva's house, Fort stood across the street. At some point, he moved to the front of the residence by the driveway. He saw Campbell pull a gun. Thereafter, Fort fired his weapon two or three times. Fort said that he was scared, that "[e]verything happened so fast," and he "had no idea what was going on."

---

*[footnote continued from previous page]*
"Q He didn't tell you, I knew a robbery was up, he said he 'knew something was up.'
"A He knew a lick was up.
"Q Where does he say that?
"A In the line directly—well, I asked him if he's going to do a lick, and his response was, 'Something, I just knew something was up.'
"Q So when you asked Mr. Fort, 'Were you going to do a lick?' He doesn't say yes, does he? [¶] . . . [¶]
"THE COURT: It's obvious at that point in time he did not say that."

During the redirect examination of Bowen, the following transpired:
"Q ([PROSECUTOR]) So, again, going back to that statement, you asked him if he knew that there—'You already know it's going to be about a lick,' he actually says, 'Uh-huh'—
"A Yes.
"Q —in the affirmative? [¶] And then, 'Yes'?
"THE COURT: No. Just—
"THE WITNESS: Yes.
"([PROSECUTOR]) And then, again, you say, 'Yes'?
"A Yes.
"Q And then he confirms, 'Yeah'?
"A Yes."

B.  *Defense Evidence*

Fort testified on his own behalf.  His cousin, Stewart, called him about 10:00 p.m. on the night of the incident.  Stewart wanted to hang out and said something about "loads of grams," which Fort understood to mean a lot of weed.  Stewart told Fort he would come by and pick Fort up.  He did not tell him to get a gun.  Fort thought that "something just didn't seem right" because his cousin does not normally call him like that.

When Fort saw a gray car pull up, he went outside.  Stewart told him to get in the red car, which he did.  Seeing two cars, he thought they were going to go to a party.  On the drive to Leyva's house, nobody mentioned anything about marijuana or a lick.  He did not go to the residence to help Campbell commit a robbery.

Fort brought a fully loaded .357-caliber firearm with him.  He said he always carries a gun for protection when he leaves the house.  He never showed his gun to anyone or told anyone he had it.

After they pulled up to Leyva's house and before getting out of the cars, Campbell texted someone.  Fort knew something was wrong because he did not see any cars or people and heard no music.  Everyone got out of the cars and spread out.  His first thought was to walk away.  He initially went across the street, away from the house.

After two or three minutes people came out of the house.  A Hispanic man was in the lead and said he wanted to speak to the person who wanted the weed.  Campbell walked up to meet the person.  Campbell and the other person were arguing.  Someone

10

handed the marijuana to Campbell, who then handed it to someone else. He did not hear any threats.

Fort moved into the street by the driveway. There were about six people standing on the walkway. He saw Campbell pull a gun out and put it in "the dude's face." At this point, he thought a robbery was going on. Prior to that time, he did not think the group was going over there to commit a robbery.

People in his group started moving towards the cars by walking backwards. He heard someone scream "gun, gun," and he thought someone was getting a gun and that individuals from the other group were coming after him. He then pulled his gun out and fired it. He explained his action this way: "I see them robbed, I hear 'gun, gun, gun,' I think they're coming out with guns. I see them screaming coming out of the door. It was a reaction."

On cross-examination, Fort said he "knew something was up" that night and he "just knew someone had a gun" because that is "how people roll." He also knew, prior to going to Leyva's house, that Campbell did a lot of licks and that Campbell brought a gun with him. He acknowledged that he had answered affirmatively when Bowen asked about how he knew he was "going to do a lick" and "to rip off some weed." Fort attempted to explain this by testifying that he did not understand what Bowen was asking at that time. Finally, he admitted that he knew that he was shooting at people when he was shooting at the house.

11

III.  ANALYSIS

A. *Failure to Instruct the Jury on Second Degree Murder and Manslaughter*

The jury was instructed solely on the theory of first degree felony murder with no instructions on lesser included offenses.  Fort contends the jury should have been instructed on the lesser included offenses of second degree murder, voluntary manslaughter based on imperfect self-defense, and involuntary manslaughter.  The Attorney General submits that the court had no duty to instruct on lesser included offenses because second degree murder, voluntary manslaughter, and involuntary manslaughter are not lesser included offenses of first degree felony murder, the sole theory pursued by the prosecution.

We first consider whether second degree murder or manslaughter are lesser included offenses of first degree murder as charged in this case.  We then address whether there is sufficient evidence in the record to support instructions on the lesser offenses.

1.  Lesser Included Offenses to First Degree Murder Under the Accusatory Pleading Test

"'California law has long provided that even absent a request, and over any party's objection, a trial court must instruct a criminal jury on any lesser offense "necessarily included" in the charged offense, if there is substantial evidence that only the lesser crime was committed.  This venerable instructional rule ensures that the jury may consider all supportable crimes necessarily included within the charge itself, thus encouraging the

12

most accurate verdict permitted by the pleadings and the evidence.' [Citation.] '[T]he rule prevents either party, whether *by design or inadvertence, from forcing an all-or-nothing choice between conviction of the stated offense on the one hand, or complete acquittal on the other.* Hence, the rule encourages a verdict, within the charge chosen by the prosecution, that is neither "harsher [n]or more lenient than the evidence merits." [Citations.]' [Citation.]" (*People v. Smith* (2013) 57 Cal.4th 232, 239-240 (*Smith*), italics added.)

Courts "have applied two tests in determining whether an uncharged offense is necessarily included within a charged offense: the 'elements' test and the 'accusatory pleading' test. Under the elements test, if the statutory elements of the greater offense include all of the statutory elements of the lesser offense, the latter is necessarily included in the former. Under the accusatory pleading test, if the facts actually alleged in the accusatory pleading include all of the elements of the lesser offense, the latter is necessarily included in the former." (*People v. Reed* (2006) 38 Cal.4th 1224, 1227-1228.) In this case, Fort argues that second degree murder, voluntary manslaughter, and involuntary manslaughter are lesser included offenses under the accusatory pleading test.

"'We apply the independent or de novo standard of review to the failure by the trial court to instruct on an assertedly lesser included offense. [Citation.] . . .'" (*People v. Licas* (2007) 41 Cal.4th 362, 366.)

13

Fort was charged in count 1 of the information with "a violation of Penal Code section 187, subdivision (a),[2] a felony, in that on or about August 20, 2010, in the County of Riverside, State of California, he did wilfully, unlawfully, and with deliberation, premeditation, and malice aforethought murder SILVESTER LEYVA, a human being." The pleading thus alleges malice murder committed with deliberation and premeditation. Significantly, the district attorney did not limit the charge to first degree felony murder.

Initially, we note that the failure to specifically allege felony murder did not prevent the prosecution from pursuing that theory at trial. In *People v. Morgan* (2007) 42 Cal.4th 593, the defendant was charged in the accusatory pleading with malice murder. The jury was instructed on, and the defendant was convicted of, felony murder. On appeal, the defendant asserted that the court erred in instructing the jury on felony murder in that it was a "'separate uncharged crime[].'" (*Id.* at p. 616, italics omitted.) The Supreme Court disagreed, stating that "a defendant may be convicted of first degree murder even though the indictment or information charged only murder with malice in violation of section 187." (*Ibid.*; see also *People v. Hughes* (2002) 27 Cal.4th 287, 369 ["an accusatory pleading charging a defendant with murder need not specify the theory of murder upon which the prosecution intends to rely."].) The court added that it continued "to reject, 'as contrary to our case law, the premise underlying defendant's assertion that

---

**2** All further statutory references are to the Penal Code unless otherwise indicated.

14

felony murder and malice murder are two separate offenses.' [Citation.]" (*People v. Morgan, supra,* at p. 616.)

Although the prosecution could and did pursue a felony murder theory in this case, we still look to the accusatory pleading to determine whether Fort was entitled to instructions regarding lesser offenses. *People v. Anderson* (2006) 141 Cal.App.4th 430 is on point. There, the defendant was charged with one count of murder under section 187, subdivision (a). After the close of evidence, the prosecution was allowed to orally amend the information by adding the theory of felony murder. The trial court gave no instructions on lesser included offenses.

In reversing the defendant's conviction, the *Anderson* court stated: "We assume for the sake of argument that, as the prosecution argues, the trial court would have had no sua sponte duty to instruct if felony murder were the only crime charged . . . . In this case however, felony murder was not the crime charged, at least in the accusatory pleading. The . . . information contained only a single charge of murder under Penal Code section 187: . . . [¶] It has been held consistently that the scope of the sua sponte duty to instruct is determined by the charge contained 'in *the accusatory pleading itself.*' [Citations.] . . . 'When an accusatory pleading alleges a particular offense, it thereby demonstrates the prosecution's intent to prove all the elements of any lesser necessarily included offense. . . .' [Citation.] . . . Because second degree murder and voluntary manslaughter are lesser included offenses of the offense charged against defendant in the amended information, defendant was on notice that she might be convicted of that crime

15

or any of its lesser included offenses—and, by the same token, that she could anticipate instructions on these lesser offenses if they were supported by substantial evidence. [¶] While we realize that, technically, the prosecution amended the information after the close of evidence to include a charge of felony murder, we conclude that this amendment should not be permitted to alter the expectations created by the original information. It is not clear from the transcript that the felony-murder charge supplanted the murder charge contained in the information, since the trial court referred to felony murder as an 'added' charge. If the original charge of murder remained, the sua sponte duty to instruct as to lesser offenses did as well. Even if felony murder had been intended to replace the existing charge, an amendment made at the close of evidence does not satisfy the notice function that underpins the duty of sua sponte instruction. [Citation.] Having established the expectation that instruction on lesser included offenses of murder would be given, if supported by the evidence, the prosecution could not defeat that expectation by amendment after the close of evidence." (*People v. Anderson, supra,* 141 Cal.App.4th at pp. 444-446.)[3]

---

[3] It does not appear from our record that any amendment to the original information was filed. The first indication in our record that the prosecution intended to rely solely on a theory of felony murder for purposes of proving the underlying murder charge was at the close of the prosecution's case, when the prosecutor indicated he was not pursuing a malice theory, but rather relying on the theory of felony murder. The issue was again addressed during the discussion between court and counsel regarding jury instructions. At that time, defense counsel withdrew certain instructions that pertained to an "alternative theory of malice aforethought."

Here, as in *Anderson,* the accusatory pleading alleged malice murder with deliberation and premeditation. Under the accusatory pleading test, the allegation of malice murder with deliberation and premeditation on its face gave rise to possible lesser included offenses of second degree murder, voluntary manslaughter, and involuntary manslaughter. (See *People v. Taylor* (2010) 48 Cal.4th 574, 623 [second degree murder is a lesser included offense of first degree murder]; *People v. Rios* (2000) 23 Cal.4th 450, 460-461 [voluntary manslaughter is a lesser included offense of murder]; *People v. Thomas* (2012) 53 Cal.4th 771, 813 ["Voluntary and involuntary manslaughter are lesser included offenses of murder."].) While the prosecutor was free to try the case on a theory of felony murder, defendants were nonetheless legally entitled under the accusatory pleading test to jury instructions on lesser included offenses of first degree malice murder, provided there is substantial evidence to support the commission of the lesser offenses but not the greater.[4]

*Smith, supra,* 57 Cal.4th 232 is also instructive. There, the defendant was charged with two counts of deterring or resisting an executive officer in violation of section 69.[5] Section 69 can be violated in two ways: first, by attempting with threats or violence to

---

[4] Because the district attorney did not limit the allegation of first degree murder to the theory of felony murder, we do not address the issue of whether second degree murder and manslaughter are lesser included offenses when only first degree felony murder is alleged. As stated in *People v. Huynh* (2012) 212 Cal.App.4th 285, 314, the "Supreme Court has left open [this] question."

[5] Section 69 provides: "Every person who attempts, by means of any threat or violence, to deter or prevent an executive officer from performing any duty imposed upon such officer by law, or who knowingly resists, by the use of force or violence, such officer, in the performance of his duty, is punishable by [fine or imprisonment, or both]."

deter an officer from performing his or her duties; and second, by resisting an officer by force or violence. On each count, the jury was instructed with the second way: that it had to find that the defendant used force or violence to resist the executive officer. On count 2, the jurors were also instructed that, in the alternative, they could find the defendant guilty of violating section 69 under the first way; that is, by finding that the defendant "'willfully and unlawfully attempted to deter or prevent an executive officer from the performance of any duty imposed upon that officer by law, and the attempt was accomplished by means of a threat of violence.'" (*Smith, supra,* at p. 238.)

In returning its special verdict on count 2, the jury marked a check-box indicating it found the defendant guilty because he violently and forcefully resisted the deputies. The jury did not check the box relative to the defendant willfully and unlawfully attempting to deter an executive officer by means of a threat of violence. (*Smith, supra,* 57 Cal.4th at p. 238.) On appeal, the defendant argued that the trial court had a sua sponte duty to instruct the jury on resisting a public officer under section 148, subdivision (a)(1).[6] He argued that while resisting a public officer may not be a lesser included offense of resisting an executive officer by means of a threat or violence, it is a lesser included offense of resisting by means of force.

The Supreme Court agreed with the defendant. It explained that because section 148, subdivision (a)(1) deals with the use of force or violence, and not with attempting by

---

[6] A violation of section 148, subdivision (a)(1) is a misdemeanor, punishing those who "willfully resist[], delay[], or obstruct[] any public officer . . . ."

18

threats or violence to deter, section 148, subdivision (a)(1) was not a lesser included offense based on the elements test. (*Smith, supra,* 57 Cal.4th at pp. 240-241.) However, as the court stated: "[I]n determining whether a trial court has a duty to instruct the jury on lesser offenses, we also consider the language of the accusatory pleading. [Citation.] If the accusatory pleading in the present case had charged only the first way of violating section 69—i.e., that defendant attempted, through threat or violence, to deter or prevent an executive officer from performing a duty—section 148[, subdivision] (a)(1) would not have been a necessarily included offense. But the amended information charged defendant with both ways of violating section 69. In addition to the first way of violating the statute, the accusatory pleading also alleged that defendant violated the statute in the second way by 'knowingly resist[ing], by the use of force or violence, such officer, in the performance of his duty.' . . . [S]ection 148[, subdivision] (a)(1) is necessarily included within this second way of violating section 69." (*Id*. at p. 242.) "[T]he amended information in the present case alleged in both counts that defendant violated section 69 not only in the first way but also in the second way by forcibly resisting an officer. As explained above, it is not possible to violate section 69 in this second way without also violating section 148[, subdivision] (a)(1). Therefore, section 148[, subdivision] (a)(1) was a necessarily included lesser offense of section 69 as alleged in the amended information." (*Id*. at p. 243.)[7]

---

[7] In a concurring opinion, Justice Corrigan observes that application of the accusatory pleading test to an information that alleges nothing more than the statutory language of the offense is wrong. "The [*People v.*] *Barrick* [(1982) 33 Cal.3d 115]

*[footnote continued on next page]*

Like violations of section 69, murder is a crime that can be committed in different ways. A conviction of murder in the first degree can be based on malice with premeditation and deliberation or on first degree felony murder. Even if second degree murder and manslaughter are not lesser included offenses of first degree felony murder, they are lesser included offenses of a premeditated and deliberate murder with malice. (*People v. Bradford* (1997) 15 Cal.4th 1229, 1344-1345; *People v. Breverman* (1998) 19 Cal.4th 142, 153-154 (*Breverman*).) The accusatory pleading in our case alleged a malice murder with deliberation and premeditation. While the accusation permits the prosecution to pursue a theory of first degree felony murder, it nonetheless gives rise to the trial court's sua sponte duty to instruct on lesser crimes of malice murder with premeditation and deliberation when warranted by the evidence.[8]

---

*[footnote continued from previous page]*
court's holding unmoored the accusatory pleading test from the principles on which it was based. In my view, charging a defendant in the statutory language coupled with the use of conjunctive pleading should not yield a different result than applying the statutory elements test." (*Smith, supra,* 57 Cal.4th at p. 247 (conc. opn. of Corrigan, J.).)

[8] In response to defendants' argument on appeal, the Attorney General relies on *People v. Huynh, supra,* 212 Cal.App.4th 285. First, we note that the rationale of *Huynh* may to some extent have been undermined by *Smith*. Second, as pointed out by the *Huynh* court, its facts are distinguishable from the facts in *Anderson*. Our case is similar to *Anderson*, and distinguishable from *Huynh*, because the accusatory pleading alleged malice aforethought; the accusatory pleading in *Huynh* did not. Further, the court in *Huynh* relied heavily on the fact that the prosecution had made it clear from the very beginning of the case that it was relying solely on felony murder. Such is not the case here.

2. <u>Substantial Evidence Shows That Lesser Offenses, But Not the Greater Offense of First Degree Felony Murder, Were Committed</u>

Under *Breverman*, instructions on lesser included offenses "are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury. [Citations.] 'Substantial evidence' in this context is "'evidence from which a jury composed of reasonable [persons] could . . . conclude[]'" that the lesser offense, but not the greater, was committed. [Citations.]" (*Breverman, supra,* 15 Cal.4th at p. 162.) Instructions of lesser included offenses should be given "when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged." (*People v. Wickersham* (1982) 32 Cal.3d 307, 323-324, disapproved on another point in *People v. Barton* (1995) 12 Cal.4th 186, 201.)

Fort was convicted on the basis that he aided and abetted a robbery during which a death causally occurred. For purposes of aiding and abetting liability for felony murder, the jury was properly instructed that the prosecution had to prove: "1. The perpetrator committed the [robbery]; [¶] 2. The defendant knew that the perpetrator intended to commit the [robbery]; [¶] 3. Before or during the commission of the [robbery], the defendant intended to aid and abet the perpetrator in committing the [robbery]; [¶] AND [¶] 4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the [robbery]." We first consider whether the evidence raises a question as to whether these elements were present.

21

Here, there is no doubt whatsoever that the perpetrator (Campbell) committed a robbery. Additionally, it is beyond dispute that Fort's conduct did in fact aid and abet Campbell's commission of the robbery. (See *People v. Cooper* (1991) 53 Cal.3d 1158, 1169-1170 ["For purposes of determining liability as an aider and abettor, the commission of robbery continues so long as the loot is being carried away to a place of temporary safety."].) However, if there is substantial evidence that Fort did not know that Campbell intended to commit a robbery or that Fort did not intend to aid and abet the robbery, then the evidence raises a question as to whether the greater offense (first degree felony murder) was committed.

We now examine the relevant evidence as to these two elements. The only evidence that Fort did not know of the impending robbery or did not intend to aid and abet the robbery, came from Fort himself. In his statement to Bowen, Fort indicated that when he received the telephone call from Stewart, Stewart did not say anything "about [a] lick"; he called simply to ask about hanging out. Fort told Bowen that no one told him to bring his gun; it was his decision to do so. Lastly, Fort said that at the time of the robbery, everything happened so fast he did not know what was going on.

At trial, Fort again stated that Stewart called him for purposes of hanging out. He thought they were going to a party, and he took his fully loaded firearm with him because he always takes it for protection when he leaves the house. On the ride over to Leyva's house, nobody said anything about marijuana or a "lick." He testified he did not go to the residence to help commit a robbery. It was not until he saw Campbell pull out his gun

22

that he thought the group was going to commit a robbery. At some point, after Campbell and others started returning to the cars, he heard someone yell "gun, gun," and thought people were coming after him. It was only then that he pulled out his gun and shot it as "a reaction" to seeing people "coming out with guns," and because he feared for his life.

Fort's testimony was contradicted or impeached by other evidence. Fort told Bowen that he took his gun because he had a "feeling something was up." In response to Bowen's question in which he asked Fort if he knew it was going to be a "lick," Fort responded in the affirmative and admitted knowing that they were going to "rip off some weed." Harris testified that on the way over to Leyva's house with Fort in the car, people discussed taking the marijuana. Fort testified that he knew "something was up" because his cousin did not normally call him. He also knew somebody would have a gun that night because he "know[s] how people roll." In particular, he knew that Campbell would have a gun and that Campbell did a lot of licks. When he arrived at Leyva's house he knew something was wrong because he did not see any cars or hear any music. After the marijuana was handed to Campbell, he saw Campbell put a gun in "the dude's face."

While the above evidence strongly suggests that Fort knew Campbell intended to commit a robbery and intended to aid and abet the robbery, that is not our inquiry. "The trial court is obligated to instruct the jury on all general principles of law relevant to the issues raised by the evidence, whether or not the defendant makes a formal request. [Citations.] That obligation encompasses instructions on lesser included offenses if there is evidence that, if accepted by the trier of fact, would absolve the defendant of guilt of

23

the greater offense but not of the lesser.  [Citations.]  To justify a lesser included offense instruction, the evidence supporting the instruction must be substantial—that is, it must be evidence from which a jury composed of reasonable persons could conclude that the facts underlying the particular instruction exist.  [Citations.]"  (*People v. Blair* (2005) 36 Cal.4th 686, 744-745.)  Here, if Fort's testimony about his knowledge and intent and his corroborating comments to Bowen are believed, a jury could have concluded that Fort did not know that Campbell was going to commit a robbery or that Fort did not intend to aid and abet a robbery and, therefore, that Fort was not guilty of first degree felony murder.

There is also substantial evidence that the lesser offense of second degree murder was committed because Fort admitted shooting at people as a "reaction" to the situation and with "no idea what was going on."  (See *People v. Memro* (1985) 38 Cal.3d 658, 700 [second degree murder lies when the defendant engages in an act in conscious disregard for human life involving a high degree of probability that it will result in death], overruled on another point in *People v. Gaines* (2009) 46 Cal.4th 172, 181, fn. 2; *People v. Pearson* (2013) 56 Cal.4th 393, 443 [a premeditated and deliberate intentional killing occurs as "'the result of preexisting thought and reflection rather than unconsidered or rash impulse.'"].)  There is also substantial evidence from which the jury could have concluded that Fort committed voluntary manslaughter.  Voluntary manslaughter may be committed when one kills with the honest but unreasonable belief of the need to defend oneself.  (*People v. Blakeley* (2000) 23 Cal.4th 82, 88-89.)  Fort's testimony that he

24

thought that people from the opposing group of people were "coming out with guns," if believed by the jury, would support a conviction of voluntary manslaughter.[9]

While on a cold record we are unable to assess Fort's credibility, there is enough evidence, viewed in light of the surrounding circumstances, from which a jury composed of reasonable persons could conclude that Fort was guilty of a lesser offense but not the greater. (See *People v. Wickersham, supra,* 32 Cal.3d at p. 324 [in deciding whether to give lesser included instructions "trial court [is not] to determine the credibility of witnesses."].) Therefore, the failure to instruct the jury as to second degree murder and voluntary manslaughter was error.

B. *The Instructional Error Was Harmless*

Any error in not giving a lesser included instruction was harmless for two reasons. First, it is not reasonably probable that the result would have been different if the omitted instructions had been given. As set forth in *Breverman*: "[T]he failure to instruct sua sponte on a lesser included offense in a noncapital case is, at most, an error of California law alone, and is thus subject only to state standards of reversibility." (*People v. Breverman, supra,* 19 Cal.4th at p. 165.) "Appellate review under [*People v.*] *Watson* [(1956) 46 Cal.2d 818] . . . focuses not on what a reasonable jury *could* do, but what such

---

[9] We reject Fort's contention that the shooting of his gun could be viewed as criminally negligent and, therefore, he could be guilty of no more than involuntary manslaughter. (See, e.g., *People v. Carmen* (1951) 36 Cal.2d 768, 776.) Although Fort's testimony, if believed, could support findings he acted without premeditation and deliberation or with an honest but unreasonable belief of the need to defend himself, there is no evidence suggesting that he fired the gun negligently.

a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result. (*Id.* at pp. 177-178.) In viewing our record as a whole and in light of Fort's statement to Bowen *prior* to the filing of any criminal charges, it is not at all probable that jury instructions on lesser included offenses would have affected the jury's verdict.

Second, because the jury found true the robbery murder special circumstance, the jury would necessarily have convicted defendant of first degree felony murder even if it had been instructed on lesser included offenses. "'"[I]n some circumstances it is possible to determine that although an instruction on a lesser included offense was erroneously omitted, the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions. In such cases the issue should not be deemed to have been removed from the jury's consideration since it has been resolved in another context, and there can be no prejudice to the defendant since the evidence that would support a finding that only the lesser offense was committed has been rejected by the jury." [Citations.]' [Citations.]" (*People v. Elliot* (2005) 37 Cal.4th 453, 475.) When, as here, "'the elements of felony murder and the special circumstance[s] coincide, the true finding[s] as to the . . . special circumstance[s] establish[] . . . that the jury would have convicted defendant of first degree murder under

26

a felony-murder theory, at a minimum, regardless of whether more extensive instructions were given on second degree murder. [Citations.]' [Citation.]" (*People v. Castaneda* (2011) 51 Cal.4th 1292, 1328.)

Therefore, although the court erred in not instructing as to lesser included offenses, the error was harmless.

C. *Robbery of Leyva*

Fort and Campbell argue that there is insufficient evidence to support the robbery conviction involving victim Leyva. In particular, they contend there is no substantial evidence that Leyva had possession of the marijuana. We disagree. Although Leyva did not have actual possession of the marijuana, his relationship with De La Torre and his involvement in the transaction was such that he had the authority to protect the marijuana. Therefore, the jury could have reasonably concluded that Leyva had constructive possession of the marijuana.

Robbery is "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211; see *People v. Scott* (2009) 45 Cal.4th 743, 749 (*Scott*).) "'A robbery cannot be committed against a person who is not in possession of the property taken or retained. [Citation.] Possession may be actual or constructive. [Citation.] "A person who owns property or who exercises direct physical control over it has possession of it, but neither ownership nor physical possession is required to establish the element of possession for purposes of the robbery statute." [Citation.] "'[T]he theory of

27

constructive possession has been used to expand the concept of possession to include employees and others as robbery victims.'" [Citation.] [¶] . . . [A]ll employees on duty have constructive possession of their employer's property and may be separate victims of a robbery.' [Citation.] In addition, 'persons other than employees may be robbery victims if they have a "'special relationship' with the owner of the property such that the victim had authority or responsibility to protect the stolen property on behalf of the owner." [Citation.] Formulated another way, the question is whether the prospective victim "may be expected to resist the taking." [Citation.]' [Citation.]" (*People v. McKinnon* (2011) 52 Cal.4th 610, 687.)

In *Scott*, the Supreme Court held that employees constructively possess their employer's property for purposes of robbery even if the employee's duties do not involve access to or control over the property stolen. (*Scott, supra,* 45 Cal.4th at p. 752.) Although *Scott* was focused on employee-victims, the court's rationale was not limited to employment relationships. In construing the robbery statute, the court explained that the Legislature, by "requiring that the victim of a robbery have possession of the property taken, . . . included as victims those persons who, *because of their relationship to the property or its owner, have the right to resist the taking*, and has excluded as victims those bystanders who have no greater interest in the property than any other member of the general population." (*Id.* at pp. 757-758, italics added.)

In holding that employees have "some implied authority" to protect the employer's property when it is threatened by a robbery, the court relied on Civil Code

section 50. (*Scott, supra,* 45 Cal.4th at p. 754.) This statute, the court explained, "establishes the right to use 'necessary force' to protect the 'property of oneself, or of a wife, husband, child, parent, or other relative, or member of one's family, or of a ward, servant, *master*, or guest.'" (*Ibid.*) While *Scott* emphasized the word "master" in Civil Code section 50 in considering the employee-employer relationship, the same statute and *Scott*'s rationale applies to one who has the right to protect the property of a "guest" when it is threatened by a robbery. (See Civ. Code, § 50.) That is, just as an employee constructively possesses the property of his employer (i.e., his "master") because he has the right to protect the property of the employer, a residential host has the right to protect, and therefore has constructive possession of, the property of his or her "guest."

In discussing the "special relationship" rationale for constructive possession, *Scott* discussed "cases addressing constructive possession by nonemployees," including *People v. Gordon* (1982) 136 Cal.App.3d 519 (*Gordon*) and *People v. Gilbeaux* (2003) 111 Cal.App.4th 515 (*Gilbeaux*). (See *Scott, supra,* 45 Cal.4th at pp. 753-754.) In *Gordon*, Joseph and Mary Lopes lived in their home with their adult son. (*Gordon, supra,* at pp. 523, 529.) The defendant and another man entered the home, displayed a gun, and bound Joseph and Mary. (*Id.* at pp. 523-524.) The men entered the son's bedroom, took a bag containing marijuana, and left. (*Id.* at p. 524.) They took nothing else. (*Ibid.*) The defendant was convicted of two counts of robbery, one against Joseph and one against Mary. Although the parents denied knowledge of their son's marijuana and there was no evidence that either parent physically possessed the items taken, the Court of Appeal held

29

that there was sufficient evidence to support the convictions because the parents had the "responsibility to protect goods belonging to their son who resides with them in their home." (*Id.* at p. 529.)

In discussing *Gordon*, the *Scott* court did not suggest that it should be limited to the parent/adult child situation. Indeed, it pointed to *Gordon* as support for the broader proposition that the victims of robbery must have "some type of 'special relationship' with the owner of the property sufficient to demonstrate that the victim had authority or responsibility to protect the stolen property on behalf of the owner." (*Scott, supra,* 45 Cal.4th at p. 753.)

In *Gilbeaux*, the Court of Appeal affirmed the convictions of robbery against two janitors who worked for an independent contractor of the property owner, a grocery store. (See *Scott, supra,* 45 Cal.4th at p. 754.) The janitorial business assigned two janitors to the grocery store, where they had the responsibility to clean and maintain the grocery store. (*Gilbeaux, supra,* 111 Cal.App.4th at pp. 518, 523.) The defendant and a compatriot bound and gagged the janitors and took the contents of the store's safe. (*Id.* at pp. 518-519.)

The *Gilbeaux* court applied the rule that "[c]onstructive possession may be in a servant or agent of a business owner." (*Gilbeaux, supra,* 111 Cal.App.4th at p. 521.) Even though the janitors were not employees of the grocery store and had no responsibility for handling the store's cash, the court concluded that "they had a special relationship with [the store] that made them akin to employees. There are many tax,

30

business, insurance, and liability reasons for a business to use contract workers rather than employees, but none of these reasons reflect on the issue of a worker's possession of the property of a business as against a robber. The janitors were servants or agents of [the store] for the purpose of the robbery." (*Id.* at p. 523.) The *Scott* court explained *Gilbeaux* by stating that "the two janitors had a special relationship with the grocery store and thus had representative capacity with respect to the grocery store sufficient for them to be in constructive possession of the property stolen." (*Scott, supra,* 45 Cal.4th at p. 754.)

*People v. Bekele* (1995) 33 Cal.App.4th 1457, disapproved on another point in *People v. Rodriguez* (1999) 20 Cal.4th 1, 13-14, provides another example of the kind of authority to protect property that supports a finding of constructive possession. In that case, the owner of a pickup truck was driving his employer's vehicle, accompanied by a coworker, when he saw the defendant burglarizing his parked truck. (*People v. Bekele, supra,* at pp. 1459-1460.) The driver and the coworker approached the truck from opposite sides as the defendant was putting a tape deck and speakers in a backpack. The defendant got out of the vehicle on the coworker's side and ran away. The coworker ran after the defendant and yelled at him to stop. Eventually, the defendant stopped and pointed a gun at the coworker. The coworker froze, and the defendant ran off. (*Id.* at p. 1460.) The defendant was later apprehended and convicted of robbery of the coworker, among other crimes. (*Id.* at pp. 1460-1461.)

31

On appeal, the defendant argued there was insufficient evidence that he robbed the coworker because the property belonged to the owner of the pickup truck, not the coworker. (*People v. Bekele, supra,* 33 Cal.App.4th at p. 1461.) The court stated: "[T]he applicable rule: 'A person must have an ownership interest in the property taken, *or some representative capacity with respect to the owner of the property taken*, or actual possession of the property taken, for the taking of the property to constitute a robbery.' [Citation.]" (*Ibid.*) The court explained that "[the coworker] had a representative capacity with respect to [the driver's] property, in that he had implied authority from [the driver] to take action to prevent its theft." (*Id.* at p. 1462.) This "implied grant of authority" gave the coworker "constructive possession of [the owner's] property." (*Ibid.*)

In the present case, De La Torre was Leyva's guest at all relevant times. For at least some portion of the evening, the bag of marijuana was left in an office inside Leyva's house, unattended by De La Torre. As De La Torre's host, Leyva had the right, under Civil Code section 50, to protect De La Torre's property when it was threatened by a robbery. (Cf. *Scott, supra,* 45 Cal.4th at p. 754.) As noted above, just as that statute supports the existence of a "special relationship" and constructive possession by an employee as to the property of his or her "master" (i.e., employer) for purposes of robbery, the statute and *Scott*'s rationale support the existence of the requisite special relationship and constructive possession by a host as to the property of his or her guest.

Moreover, despite the obvious factual differences between the present case and *Gordon*—e.g., Leyva was not De La Torre's parent and De La Torre did not reside with

32

Leyva—*Gordon* is analogous and supports our conclusion. The rationale of *Gordon*, as *Scott* pointed out, is that the victims (the parents) had constructive possession of the owner's (the son's) marijuana because they had the "responsibility to protect the goods belonging to" the son. Indeed, additional facts in the present case indicate that Leyva's authority to protect the property of De La Torre was greater than that of the parents in *Gordon*. Not only was De La Torre a guest of Leyva, but there is evidence that Leyva acted as a broker or agent for the sale of De La Torre's marijuana: Leyva met with Campbell in a hookah bar and exchanged telephone numbers for the purpose of conducting marijuana transactions; the meeting for the transaction was arranged through text messages from Campbell to Leyva; they met at Leyva's house; Leyva was involved in discussions concerning the price of the marijuana; as indicated by De La Torre's testimony that Leyva "wanted to make some money or something," Leyva appeared to have a financial stake in the transaction; when the ostensible buyers arrived the second time, Leyva demanded to speak with the person he met in the hookah bar and, according to De La Torre, was the person "doing the talking"; finally, Leyva's aggressive action and comment about knowing Campbell's "homies" after Campbell had pointed a gun at him further suggests that Leyva had the authority to protect De La Torre's marijuana. There is thus ample evidence from which to conclude that Leyva was acting in a representative capacity with respect to the handling of De La Torre's marijuana and had the implied authority to protect such property when threatened by robbery. There was,

33

therefore, sufficient evidence to support a finding that he had constructive possession of the property.

D. *Stay of Section 12022.53, Subdivision (d) Sentence Enhancement on Count 3*

Fort was convicted of murder (count 1), robbery of Leyva (count 2), and robbery of De La Torre (count 3). As to each, the jury found true allegations that Fort personally and intentionally discharged a firearm and proximately caused death or great bodily injury within the meaning of former section 12022.53, subdivision (d) (hereafter subdivision (d)). The court sentenced Fort on count 1 to life without the possibility of parole, plus 25 years to life for the subdivision (d) enhancement. On each of the robbery counts, the court imposed a three-year prison sentence. The sentence on count 2 was stayed pursuant to section 654. The court stayed the sentences for the subdivision (d) enhancements on the robbery counts because it believed that "only one use allegation may be used." The People did not object to the sentence. The abstract of judgment for Fort reflects the stay of the subdivision (d) enhancements.

On appeal, the Attorney General contends the court erred in staying the subdivision (d) enhancement on count 3, and that the error must be corrected because it constitutes an unauthorized sentence. Fort argues that the People have forfeited the claim because of the failure to raise it below.

Although the issue was not raised below, the People "'may raise for the first time on appeal . . . the question of whether a sentence was unauthorized by law.' [Citation.]" (*In re Renfrow* (2008) 164 Cal.App.4th 1251, 1256.) A sentence is unauthorized if the

34

trial court cannot legally impose it under any circumstances in the particular case, including "where the court violates mandatory provisions governing the length of confinement." (*People v. Scott* (1994) 9 Cal.4th 331, 354, fn. omitted.) The forfeiture question, therefore, turns on whether the court, by failing to impose the subdivision (d) enhancement on count 3, violated a mandatory provision governing the length of confinement.

Subdivision (d) provides, in relevant part: "[A]ny person who, in the commission of a felony specified in subdivision (a), . . . personally and intentionally discharges a firearm and proximately causes great bodily injury . . . or death, to any person other than an accomplice, shall be punished by an additional and consecutive term of imprisonment in the state prison for 25 years to life." Murder and robbery are among the crimes specified in subdivision (a) of that statute. (§ 12022.53, subd. (a)(1), (4).)

Subdivision (f) of section 12022.53 provides: "Only one additional term of imprisonment under this section shall be imposed per person for each crime. If more than one enhancement per person is found true under this section, the court shall impose upon that person the enhancement that provides the longest term of imprisonment. . . ." In *People v. Oates* (2004) 32 Cal.4th 1048, the Supreme Court held that this subdivision "limit[s] the number [of subdivision (d) enhancements] only 'for each crime,' not for each transaction or occurrence and not based on the number of qualifying injuries." (*Id.* at p. 1057.) Thus, when "the requirements of the subdivision (d) enhancement have been satisfied as to each of defendant's . . . convictions, subdivision (f) of section 12022.53

35

*requires* that the enhancement be imposed as to each conviction." (*Id.* at p. 1056.) Stated differently, when the enhancement applies, the imposition of the additional time of confinement is mandatory. As such, the court's failure to impose the enhancement is an unauthorized sentence and, therefore, can be raised for the first time on appeal. (See *In re Renfrow, supra,* 164 Cal.App.4th at p. 1256.)

The mandatory nature of the enhancement also determines the outcome on the merits. There is no dispute that the requirements of subdivision (d) have been satisfied as to each of Fort's convictions. The trial court was therefore required to impose the punishment for the enhancement for each conviction not stayed under section 654. We will direct that the sentence be corrected accordingly.

## IV. DISPOSITION

The sentence as to Fort on count 3 shall be corrected to reflect the imposition and execution of an additional and consecutive term of imprisonment for 25 years to life pursuant to section 12022.53, subdivision (d). The trial court is directed to prepare a minute order and amended abstract of judgment to reflect the corrected sentence. The trial court is further directed to forward a copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.

As corrected, the judgment is affirmed.

CERTIFIED FOR PARTIAL PUBLICATION

KING

J.

36

We concur:

HOLLENHORST
                           Acting P. J.

McKINSTER
                                J.